(62 South. 938.)

No. 18,998.

DUNLAP v. WHITMER et al.

(March 17, 1913. Rehearing Denied June 30, 1913.)

*(Syllabus by the Court.)*

1. EXECUTION (§ 233*) — SALE — PAYMENT — DRAFT—"LAWFUL MONEY."

The sheriff, in the execution of a writ of seizure and sale, is merely an executive officer charged with the execution of the court's command to seize and sell the property, described in the writ, for money, and to pay the money to the plaintiff, to the amount called for by the writ. Under the mandate of the court, he is unauthorized to receive anything in satisfaction of the writ save the lawful money of the United States, and the draft of a local bank in an interior town, upon a bank in the city of New Orleans, is not lawful money of the United States.

[Ed. Note.—For other cases, see Execution, Cent. Dig. §§ 654–657½; Dec. Dig. § 233.*

For other definitions, see Words and Phrases, vol. 5, pp. 4031–4032.]

2. EXECUTION (§§ 233, 237*)—SALE—FAILURE TO COMPLY WITH BID—RESALE—TAXES.

The adjudicatee of property advertised under a writ of seizure and sale to be sold for cash is bound to comply with the demand of the sheriff to make immediate payment (within the limits of his bid) in money to the amount called for by the writ; and, upon his failure so to do, it is the duty of the sheriff immediately to reoffer the property, unless the plaintiff is willing that delay shall be granted. And where the amount bid is sufficient to cover that called for by the writ, together with the unpaid taxes upon the property which has been adjudicated, the sheriff may also require, as a condition precedent to his making of a deed, that the adjudicatee shall place in his hands a sufficient sum wherewith to pay such taxes; but he has no right to require a further sum demanded by the plaintiff in the writ for the reimbursement of moneys expended by such plaintiff in the payment of taxes of past years.

[Ed. Note.—For other cases, see Execution, Cent. Dig. §§ 654–657½, 660, 661; Dec. Dig. §§ 233, 237.*]

3. EXECUTION (§ 237*)—SALE—FAILURE TO COMPLY WITH BID—RESALE—VALIDITY.

The proposition that a party representing a comparatively small interest in a second mortgage upon property which he values at $180,000 can attend a sheriff's sale of such property, to be made for cash, with the avowed purpose of forcing the bidding up to $125,000, and yet that, in the event of the adjudication of the property to him for a much less sum, he should not be expected to have at his command, in money, the amount required to satisfy the writ under which the sale is made, and that the plaintiff in the writ is guilty of such trickery or immorality, in insisting upon the immediate payment of such amount, as would authorize the setting aside of an adjudication to him upon a reoffering of the property, and the affirmance of the first adjudication, on the ground that the adjudicatee had offered to pay in the drafts of a local bank upon banks in the city of New Orleans, is untenable.

[Ed. Note.—For other cases, see Execution, Cent. Dig. §§ 660, 661; Dec. Dig. § 237.*]

4. EXECUTION (§ 237*) — SALE — FAILURE TO COMPLY WITH BID—RESALE—VALIDITY.

When, upon an adjudication for cash of property offered for sale under a writ of seizure and sale, the sheriff, acting to the knowledge and apparently under instructions of the plaintiff in the writ, demands of the adjudicatee the immediate payment of a sum largely in excess of that required by the writ, with the amount required for the payment of the unpaid taxes added thereto, and the adjudicatee finds an amount sufficient to meet those requirements, but insufficient to meet the demand of the sheriff, and the property is thereupon reoffered and adjudicated to the plaintiff in the writ, the first adjudication will be affirmed and the last annulled, though no actual tender was made by the first adjudicatee, since the consequences of his having been misled should fall upon the person through whose fault it happened.

[Ed. Note.—For other cases, see Execution, Cent. Dig. §§ 660, 661; Dec. Dig. § 237.*]

Breaux, C. J., dissenting.

Appeal from Sixteenth Judicial District Court, Parish of St. Landry; B. H. Pavy, Judge.

Action by James E. Dunlap against Robert F. Whitmer and another. From judgment for plaintiff, defendants appeal. Affirmed.

Dart, Kernan & Dart, of New Orleans, and Gilbert L. Dupre, of Opelousas, for appellant Whitmer. Lewis & Lewis, of Opelousas, for appellant Swords. E. B. Dubuisson, of Opelousas, for appellee.

## Statement of the Case.

MONROE, J. The defendant Whitmer, being the holder of a first mortgage and largely interested in a second mortgage upon a body of land containing some 18,000 acres in the parish of St. Landry, caused the same to be seized under executory process and offered for sale at Opelousas, and, he (through his counsel) and the plaintiff herein (who owned or represented an interest in the second mortgage) being the only competitive bidders, the land was adjudicated to plaintiff for $80,000. The sheriff, acting under the advice of his counsel, given in consequence of the demand of the counsel for the plaintiff in the writ (defendant herein), called for payment of $50,000 of the amount bid in cash; the adjudicatee failed to produce that amount of cash but tendered "exchange," drawn by an Opelousas bank upon different banks in New Orleans, which the sheriff, still acting under advice, declined to receive, and thereafter he reoffered the property and adjudicated it to defendant, as the only bidder, for $45,000; plaintiff, through his attorney, giving notice that he stood upon the first adjudication and that the purchaser would buy a lawsuit. Plaintiff then brought this suit against the last adjudicatee and the sheriff to confirm the first and annul the last adjudication, or, in the alternative, to recover $103,358.40, the difference between the alleged value of the property ($183,358.-40) and the $80,000 bid by him; the grounds relied on being that the demand for cash and the refusal to accept the exchange were illegal and were the results of a fraudulent conspiracy between said two defendants. Defendants denied the alleged conspiracy and affirmed the legality of the course pursued by them; and the sheriff, by way of reconventional demand, set up a claim for damages for libel, which was dismissed upon an exception of no cause of action. On the merits there was judgment in the district court in favor of plaintiff, sustaining the adjudication to him and annulling that under which the defendant claims title. Both defendants have appealed. The facts disclosed by the evidence are as follows:

In 1902 C. W. Krotz, a resident of Ohio, bought the land in question for a recited consideration of $25,000, of which $6,000 is said to have been paid in cash, and for the balance of which he gave four notes of $4,-750 each, secured by first mortgage and vendor's lien and bearing interest at 8 per cent. from January 1, 1902. In May, 1902, he transferred the land to the Latannier Land Improvement Company, a Delaware corporation, of which he was president, for the stated consideration of $250,000, to be represented by that company's "first mortgage gold bonds," which were to be issued and delivered to him; and shortly afterwards a common-law mortgage was imposed upon the land to secure said bonds, which were delivered to Krotz, with the exception of $50,-000 of them, which are said to have been deposited with some institution in Ohio as security against the first mortgage. Krotz and the Latannier Company seem then to have kept the title to the land and the $200,-000 of bonds, which were left on hand, moving about rather actively. In February, 1904, the land appears to have been sold to the Krotz Manufacturing Company, F. E. Creelman Lumber Company, and F. E. Creelman; and the bonds, as we infer, were disposed of by Krotz whenever and wherever he could find a market. Defendant tells of his connection with the business as follows:

"To begin with, we bought or loaned some money to a lumberman, $50,000, on what we supposed to be first mortgage bonds on some land in Louisiana; that was the first step. We were to be paid back as soon as another issue of bonds was put on this property. The next thing I knew this concern went broke. I came down here to look at the property, and when I got here I found these bonds were not first mortgage bonds; that there was an underlying mortgage on it. I saw I had to buy this to protect what bonds I did have. I also

bought some bonds of Krotz from the Melville bank; I did that to protect myself. Then I came down and would have started to foreclose on the mortgage, and one injunction was had, then another, and I could not do anything."

In the meanwhile (i. e., before the attempt to foreclose) it appears that the Creelman Company, whilst holding the title to the land, had gone into bankruptcy in Danville, Ill., and defendant was drawn into that litigation, at least to the extent that the counsel whom he had employed here was obliged to go up there several times in order to protect his interest. In the meanwhile, also, the defendant and his counsel appear to have busied themselves in an effort to get all the holders of the Krotz bonds to unite with defendant for their mutual protection, defendant offering to share his interest in the first mortgage with any of them, who were willing to put up a proportionate share of the money that had been expended; and as a result it appears that, at the time of the trial, the first mortgage was owned in equal proportions by defendant and Mr. Lamar, a banker from Pensacola, and that they also either own or control 75 per cent. of the Krotz second mortgage bonds. The writ of seizure and sale, under which the adjudications here in question were made, was issued in June, 1907, and was enjoined by Krotz in October of that year. A similar injunction was issued at the same time at the instance of Daniel D. Healy, appearing as the receiver of an Illinois bank, which owned some of the bonds. Those injunctions, for various reasons, could not be brought to trial until November, 1909, and during the interval defendant and his home counsel came down here from Philadelphia several times on account of them and brought witnesses.

Upon those occasions, or one of them, the plaintiff herein appeared upon the ground and seemed to be affiliating with Healy and Krotz; and as defendant had written to him, making the offer to which we have referred and the offer had been rejected or ignored,

he was regarded as a person who was likely to place obstructions in the way of the enforcement of defendants' claim. Eventually, in November, 1909, when the injunction suits were again fixed, with a probability of their being tried, that of Healy was dismissed at his instance for reasons which do not appear in this record, and that of Krotz was dismissed at his instance on payment of a sum of money claimed upon some ground not appearing in the record, by two ladies bearing his name. There appears, then (on November 23, 1909), to have been an alias order made under which the sheriff proceeded to advertise the land (seized in June, 1907) for sale on January 15, 1910. Plaintiff, having received a copy of the advertisement, appeared on the scene upon the day preceding that fixed for the sale. Defendant, with his home (Philadelphia) lawyer and his New Orleans lawyer, arrived in the early morning of that day. During the morning plaintiff and defendant met in a hotel, and according to the testimony of defendant which we do not find contradicted by plaintiff, they had a conversation in which plaintiff said that he had expected that defendant would make some arrangement about his (plaintiff's) bonds; that he had $33,000 of them and wanted 50 cents on the dollar; and that, if defendant did not take them at that price, it would cost him more than that to get the property, as he (plaintiff) intended to bid it up. Defendant declined to buy the bonds at the price stated, but offered 25 cents on the dollar, or in the alternative said that he would sell his own bonds at 50 cents. He further proposed to plaintiff that the latter should go in with him and Lamar, pay one-third of the amount that they had expended in acquiring the first mortgage, paying taxes, etc., and share the proceeds of the sale in proportion to his interest. All of which propositions were declined. There also appeared in Opelousas on the morning of the

day fixed for the sale a Mr. Squires, who called on the sheriff and, informing him that he had received a telegram from a Mr. Ansberry, of Defiance, Ohio (who it seems held or represented some of the Krotz bonds), requesting him to bid on the land up to $160,-000, and, in the event of its being adjudicated to him, to draw on him for the amount required to make his bid good, asked whether the sheriff would accept such a draft, to which the sheriff replied in the negative and advised Mr. Squires to consult a lawyer. Mr. Squires thereupon requested plaintiff to accompany him and together they called upon Lewis & Lewis (who, as it happened, were the regular legal advisers of the sheriff), and Mr. Squires was advised that the sale was to be made for cash and that a draft such as he proposed to offer could not be accepted in lieu of cash. Plaintiff in his testimony says that he knew that Squires had the telegram from Ansberry and admits that he was present at the interview with Lewis & Lewis, but he also says that he went with Squires to the office of Lewis & Lewis merely because Squires asked him; that he did not know what Squires wanted to consult with Lewis & Lewis about and felt no interest in it, and did not pay attention to the conversation or know what Squires asked or what information was given him. The only thing about which he is at all clear being that Squires told him that he found that Lewis & Lewis were the attorneys of the defendant herein, which was not the fact; they having been the attorneys of the sheriff, engaged in advising him in this matter, and never having been in the employ of the defendant. Plaintiff's habit of observation or memory is at fault in regard to another circumstance bearing upon the same point. The deputy sheriff who was to make the sale, after reading the advertisement, etc., announced in a clear and distinct voice, which seems to have been heard by every one in the assembled crowd except the plaintiff, that the sale would be made for cash, and that whoever purchased the property would be expected to pay in cash the amount called for by the writ. Plaintiff, who was standing nearer to the deputy than most of the crowd, who was there for the purpose of bidding on the property, who testifies that he intended to bid it up to $125,000 and then "drop it" on the defendant, who had come as a stranger to a strange town to attend a cash sale without bringing any cash with him or making, or attempting to make, any arrangement or to arrive at any understanding as to the manner in which he was to make his bid good, further testifies that he did not hear the announcement or does not remember that he did so.

After the property had been adjudicated, the deputy sheriff was reminded by defendant's counsel that he expected to be paid the amount due his client in cash, and the deputy asked the adjudicatee (plaintiff herein) whether he was prepared to make such payment to which he replied, in effect, that he was not, but that, if given a reasonable time, he would be prepared. Being asked by the sheriff what he would consider a reasonable time, he said:

"If you will give me 30 minutes, I will get the money."

And the sheriff, looking at his watch, said:

"It is now 30 minutes past eleven; I will give you until 12:10 to get the money."

Plaintiff then made some inquiries which led to his being introduced to the counsel by whom he is now represented, and who, as it happens, is not only a member of the bar, but is and was at that time president of one of three banks established in Opelousas; and they went to the bank together for the purpose of arranging to get $45,000, which they were informed was the amount required to satisfy the writ held by the sheriff, and which amount, it was intimated,

would be paid to the sheriff in silver. Plaintiff, as we have stated, was a stranger in Opelousas, and, though he had come with the intention of bidding $125,000 on property which was to be offered at sheriff's sale for cash, he was unprovided with cash, letters of credit, or even letters of introduction. He was, however, the president of a bank in the town of Plaquemines, which had credits in some of the banks in New Orleans, and, after some telephoning or telegraphing, his counsel, as president of the Opelousas National Bank, became satisfied that the money that he needed could be safely advanced to him, and an effort was made to obtain it through the aid of the other two banks.

He (the counsel) testifies upon that subject as follows:

"The authorities of both of the banks, after an inquiry over the telephone, wanted time to see how much money they could let us have. We were finally promised $10,000 by one of the banks and $5,000 from the other. So far as we were concerned, by straining a point, we were able to raise $25,000. While these negotiations were going on, some one came from the sheriff's office and stated that the amount that the sheriff would require would be $50,000 instead of $45,000. * * * I knew absolutely nothing about what the writ called for or what was required. As our bank, with the assistance of the other two, could only raise $40,000, I determined, in the interest of Mr. Dunlap, to do the next best thing and to go to the sheriff's office with what we call 'New Orleans exchange'; that is, drafts, drawn by our bank on its correspondents in New Orleans, amounting in the aggregate to $50,000."

And the drafts were accordingly drawn and tendered to the sheriff who, being examined by his own counsel (Mr. J. W. Lewis, the junior member of the firm of Lewis & Lewis), testifies as follows upon that subject:

"I said, 'I am willing to receive them, provided Mr. Whitmer's attorney is willing to take them to satisfy the writ;' and I asked Mr. Dart [Mr. Whitmer's attorney] if he was willing to accept those checks, as I considered them good, and he said, 'Well, I will look to you, Mr. Sheriff, for the money.' I then told Mr. Dubuisson [plaintiff's attorney] that I could not receive them as Mr. Dart looked to me for the money and I did not have the money, and I returned the checks to Mr. Dubuisson. Q. At this point, do you remember whether your attorney was there at that time and whether you referred those checks to him? A. Yes, sir; they were there, and Mr. Lewis stayed there during the whole proceedings, and you were there part of the time. You were the man that told me that I could not take the checks; that the terms were cash; the seizing creditors were demanding cash, and I would have to get the cash."

Thereafter the land was reoffered (plaintiff's attorney protesting) and, there being no other bidder, was adjudicated to defendant at $45,000. On the Tuesday following (January 18th) plaintiff made a tender of $50,000 in money, which was refused; the sheriff, having, in the meanwhile, completed or partially completed the deed to defendant.

The writ under which the sale was made called for $19,000, with interest at 8 per cent. from January 1, 1902, 10 per cent. on the aggregate of principal and interest as attorney's fees, and the costs of the proceeding; the whole amounting, on the day of the sale, to $34,905.59, to which was to be added the unpaid taxes for the year 1909, without payment of which the sheriff could not lawfully have conveyed the property to the adjudicatee, and which amounted to $3,077.66, making a grand total of $37,983.25. In making his demand upon the adjudicatee, the sheriff added a further amount intended to cover the claim of the plaintiff in the writ for reimbursement of moneys expended in the payment of the taxes on the property for the years 1904, 1906, 1907, and 1908, the total of principal and interest so claimed being $10,314.41, for which amount defendant, on the morning of and prior to the sale, filed what are termed petitions of intervention and third opposition in his proceeding via executiva, alleging that he was subrogated to the rights of the state and was entitled to be paid from the proceeds of the sale by preference over all other creditors of the defendant in said proceeding, and on which petitions he obtained judgment with the con-

sent of said defendant and the sheriff. There was, however, no other writ issued than that which directed the sheriff to seize and sell the property to pay and satisfy the original claim of $19,000, with interest, attorneys' fees, and costs.

#### Opinion.

[1] The writ under which the sheriff acted reads in part:

"You are hereby commanded to seize and sell the following described property, to wit: * * * For cash, to pay and satisfy the sum of $19,000, with 8 per cent. per annum interest thereon," etc.

When such is the obligation of the contract, pay, under our law, means the delivery of a sum of money. C. C. arts. 1905, 2131.

A bill of exchange is not money but is an "order in writing addressed by one person to another * * * requiring the person to whom it is addressed to pay * * * a sum certain in money," etc.

"A bill of itself does not operate as an assignment of the funds in the hands of the drawee available for the payment thereof, and the drawee is not liable on the bill unless and until he accepts the same." Act 64 of 1904, §§ 126, 127, p. 165.

"An officer whose duty it is to make a sale of the property, either under execution or pursuant to a decree in chancery, is vested with a limited authority and has no power to direct or change the terms of the sale. Those terms are fixed, either by law or by specific directions contained in the execution, decree, or order of sale. The sale must ordinarily be for cash only, and the officer has no power to accept anything but an unconditional cash bid. He cannot accept in payment of the bid anything but lawful money; and, if he takes the check of the bidder, he is doubtless answerable for the amount thereof if the plaintiff does not choose to accept it in payment. As the plaintiff is the person entitled to the fruits of the sale, he may waive his right to payment in money, and the sheriff may accept payment in such mode as may be satisfactory to the plaintiff." 2 Freeman on Execution, § 293a, p. 1695.

The rule thus stated was the law of this state prior to the adoption of the Code of Practice. Dufau v. Massicot, 3 Mart. (O. S.) 294; Durnford v. Degruys, 8 Mart. (O. S.) 220, 13 Am. Dec. 285; Dufour v. Camfranc,

11 Mart. (O. S.) 708; Baudin v. Roliff, 1 Mart. (N. S.) 165, 14 Am. Dec. 181. And it has been the law ever since the adoption of that Code. In a case decided in 1832 it appeared that the plaintiff had purchased a tract of land at a credit sale and had given a 12 months bond, with surety, for the price; that upon its maturity execution issued on the bond, and the land was seized and advertised to be sold for cash; that plaintiff and several other persons were bidders at the offering, and that the land was adjudicated to plaintiff at $595; that the sheriff demanded the money and was told that it would be paid on the next day; that the sheriff refused to wait (though plaintiff offered to furnish security) and offered the property again, when it was adjudicated to one of the defendants, who had agreed with the others that he should act for them all. Plaintiff sued to annul the sale upon the grounds, among others, that the second adjudication was null because title was vested in him by the first; that he was entitled to retain the price until the sheriff made a deed; that the sheriff had no right to reoffer the property until he had made a tender of such deed, for which 3 days, or 24 hours at least, were allowed; that the sheriff refused to wait any time for the first purchaser to pay the money, though he was informed that he had it; that there was an illegal conspiracy among the defendants to defraud plaintiff and purchase his property at a great sacrifice.

Referring to the alleged "right acquired by the bid of the former purchaser, although he did not immediately comply with the condition of the sale, which was for cash," Mr. Justice Matthews, as the organ of this court, said:

"In support of this right, reliance is had on the articles of the Code of Practice, 690–695, and on the articles of the Louisiana Code, 2588–2590. The provisions of the Louisiana Code relate to sales by auction both to voluntary and forced sales; but we are of opinion that the article 2589 is particularly applicable to vol-

untary sales, as is also the preceding article. The Code of Practice relates to sheriffs' sales, and, according to the articles cited, an adjudication has the effect of transferring to the purchaser all the rights of the party in whose hands the property was seized; and the sheriff is allowed three days within which he must make an act of sale in form. The transfer of rights does not, in our opinion, take place; and consequently the officer is not bound to perfect the sale by an act translative of them to the purchaser, unless the latter has complied with the conditions of such sale. The condition of the adjudication, in the present instance, was that the purchaser should pay cash; this he was unable to do; and the sheriff was authorized to expose the property for sale anew and to adjudge it to another person. * * * As to the want of honesty in the conduct of the persons to whom the adjudication was made, it is not shown that they acted in violation of any positive municipal regulation; and the morality or immorality of their proceedings is involved in so much doubt as not to form the basis for a decree annulling the sale." Stoute v. Voorhies et al., 4 La. 392.

In another case, in which a bank obtained execution, the property seized was adjudicated to the wife of the defendant, who tendered in payment the notes and bonds of the plaintiff, which the sheriff refused to receive. This court said:

"The sheriff was a mere executive officer, charged with the execution of the judgment of the court. The command of the writ * * * was to seize and sell defendant's property for money and to pay that money to the plaintiff in execution to the amount of his claim. The mandate of the court empowered him to receive no money but the lawful money of the United States. What was tendered was bank notes or bonds, purporting to be obligations of the plaintiff in execution." Osburn v. Curtis, 2 La. Ann. 764.

Other cases pertinent to the issues here presented are Lafon v. Smith, 3 La. 474; Walker v. Allen, 19 La. 308; Gallier v. Garcia, 2 Rob. 325; Bank of Orleans v. Hodge, 8 Rob. 455; Felps v. Commissioners, 10 Rob. 89; Converse v. The Sydonia, 13 La. Ann. 268; Washburn v. Green, 13 La. Ann. 332; Pendarvis v. Wall, 14 La. Ann. 449; Haynes v. Breaux, 16 La. Ann. 143; Branner v. Hardy, 18 La. Ann. 542; Insurance Co. v. Ruddock, 22 La. Ann. 46; Doll v. Kathman, 23 La. Ann. 486; Losee v. Sauton, 24 La.

Ann. 370; Michel v. Kaiser, 25 La. Ann. 57; Dobard v. Bayhi, 36 La. Ann. 135; McCall v. Irion, 41 La. Ann. 1126, 6 South. 845; Interdiction of Onorato, 46 La. Ann. 73, 14 South. 299; American Land Co. v. Pierce, 49 La. Ann. 390, 21 South. 972.

In what appears to be the latest case, upon the subject of the right of the sheriff to reoffer property adjudicated under a writ of seizure and sale, it was held (quoting the syllabus on the rehearing):

"Where real estate is adjudicated for cash at a judicial sale, the purchaser cannot retain the price until the act of sale is passed, as provided in case of a voluntary sale at public auction, but must comply with his bid on the demand of the officer making the sale." Beck v. Progressive Realty Co., 130 La. 43, 57 South. 578.

Counsel for plaintiff cites the Supreme Court of the United States (In re Palliser, 136 U. S. 257, 10 Sup. Ct. 1034, 34 L. Ed. 514) to the effect that, for the purposes of the statute making it an offense for postmasters to sell or dispose of postage stamps except for cash, the word "cash" means "ready money, or money in hand, either in current coin or other legal tender, or in bank bills, or checks, paid and received as money." A decision to the effect that a judgment creditor can be compelled to accept, in payment and satisfaction of his execution, "bank bills or checks, paid and received as money," would be more to the point, and yet it could not control the jurisprudence of this court in the matter of the established interpretation of the law of the state. The same thing may be said of the decision in Chick v. Robinson, 95 Fed. 619, 37 C. C. A. 205, 52 L. R. A. 833, where it was sought to hold one Comstock liable as a general partner on the ground that he had failed to secure the exemption of a limited partner by reason of the fact that he had paid his contribution to the capital in certified checks instead of cash, and where it was held, the checks having been duly honored, that the statute, requiring such pay-

ment to be made in cash had been sufficiently complied with. And of the decision in People v. Stockton, etc., R. Co., 45 Cal. 306, 13 Am. Rep. 178, where it was set up, as a ground for the ouster of a corporation, that a certain proportion of stock, required by statute to be paid for in cash, had been paid for in checks, and where the court, finding that the checks had been drawn against sufficient funds, and that money had thereafter been substituted in place of the checks, held that the statute had been sufficiently complied with.

The case of Farr v. Sims, Rich. Eq. Cas. 122, 24 Am. Dec. 396, also cited by counsel for plaintiff, was an extreme one. One Stevens went to a bank and, without apparent necessity, bought from it a judgment against Sims, for which he gave his note; he then caused execution to issue and directed that the property seized should be sold for specie; and he testified that he did so expecting to buy it in at a low price. No particular notice was given that specie would be demanded, and no other bidder than he was prepared to pay in such money, so that, although there was a bid of $3,000 payable in currency, the property was adjudicated to the defendant at $1,000.

In setting aside the sale, the court said:

"The usual terms of a sheriff's sale are cash. The term 'cash' has two meanings: One a payment in current bills; the other in specie. The first is the *popular*, the latter the *legal*, meaning. The former has, in common parlance, entirely supplanted the latter. An advertisement that the sale was to be for cash would be understood by every one to be for current bills."

The proposition with which we are now confronted is that an advertisement that a sheriff is to sell for cash is to be understood as meaning that he may be compelled to accept the drafts of a local bank drawn upon a bank in another place and may compel the seizing creditor to accept such drafts in payment of his judgment, or else wait for his money until they can be collected by the sheriff, who is to assume the responsibility of making such collection.

[3, 4] The case cited is not, however, analogous in other respects to the case at bar. The defendant now before the court did not deliberately go out and buy a judgment with a view of oppressing any one. He invested $50,000 in what was represented to be a first mortgage, but which he found to be a one-fifth interest in a second mortgage, upon property which had cost but $25,000, of which only $6,000 had been paid in cash; and for five or six years thereafter he busied himself in spending more money in order to protect his first investment, in trying to get others, similarly situated, to co-operate with him, and in litigation. He was therefore exhausted and, upon the advice of his counsel, was standing upon his legal rights, and the plaintiff distinctly placed himself in the same attitude, for he attended the sale with the preconceived and preannounced purpose of so exercising his legal rights as to compel defendant to pay him more for his bonds than defendant thought they were worth. But, intending, though he did, to force the bidding up to $125,000 on property to be offered at sheriff's sale for cash in a town in which he was a stranger, plaintiff, as we have said, made no provision for the contingency which has befallen, and he not only did not inquire what would be expected of him in the event of the adjudication of the property to him, but he appears to have closed his ears to all information on that subject. If he had chosen to inquire, he would have been advised that the sheriff could not exact of him more than his writ called for, *plus*, we will say, the unpaid taxes, or a total of less than $40,000; and the proposition, all the circumstances considered, that he could attend the sale for cash of property which he alleges is worth over $180,000, and force the bidding up to $125,000, and yet not be expected to have at his im-

mediate command as much as $40,000, and that the seizing creditor, whom be intended thus to force, is guilty of trickery or immorality' in insisting upon his legal right to immediate satisfaction of his judgment, appears to us to be untenable.

[2] Plaintiff being a banker, however, and in good credit, and being fortunate in securing as his legal adviser a member of the bar who is also prominent in banking circles, succeeded, in spite of the disadvantages to which we have referred, in raising the cash required for the purposes of his bid; the evidence showing that the amount actually in hand was about $42,000. But the sheriff had demanded $45,000, and afterwards $50,000, and we find nothing in the record to justify the belief that he would have accepted anything less than the sum last mentioned. As appears in the statement which precedes, the total amount called for by the writ was $34,905.59; but the law (R. S. 2519, 2520, 3615, 3616; Act 170 of 1898, §§ 74, 75), makes it a penal offense for a sheriff to execute any act conveying real estate unless the taxes due thereon shall have been paid; and, as the amount bid for the property here in question was sufficient to satisfy plaintiff's writ and also to pay the taxes, it follows that the sheriff had the right to require the adjudicatee to place in his hands a sufficient amount to meet both requirements (that is to say, he had the right to demand that the writ be satisfied, because that was what he was ordered by the writ to do); and he had the right to refuse to execute an act of sale to the adjudicatee until the taxes were paid, because that was what the law required him to do. Neither the writ nor the law, however, required or authorized him either to demand that the adjudicatee should place in his hands the money needed to reimburse the taxes previously paid by the plaintiff in the writ nor to refuse to execute a deed in conformity to the adjudication until such reimbursement should be made. It can make no difference, in so far as the eventual liability of the adjudicatee for the $80,000 bid by him is concerned, but the question, To whom is he to pay the balance, over and above the amounts called for by the sheriff's writ and by the demand for the unpaid taxes? is one in which others besides the defendant are interested, but with which, as matters stand, neither the defendant in the executory process nor the sheriff appears to have any concern. The judgment obtained, by the consent of those parties, on the intervention and third opposition filed by defendant did not therefore affect the situation.

It is argued, on behalf of defendant, that plaintiff should have ascertained how much the sheriff had the right to demand of him, and that the burden rested upon him to make a tender of a sum sufficient to cover such amount; but we think not. The sheriff was representing the plaintiff in the writ and no doubt acted under his instructions, and the result was that the adjudicatee was misled, and the consequences do not fall upon him, but upon the plaintiff in the writ (represented by the sheriff), through whose fault it happened.

In conclusion we find plaintiff's allegations of fraudulent conspiracy between the defendant and the sheriff entirely unsupported by the evidence, but we are not prepared to say that they were altogether irrelevant, and we are therefore of opinion that the case is not within the rulings of this court sustaining the action of damages for libel on account of language used in pleadings in judicial proceedings.

Judgment affirmed.

See dissenting opinion of BREAUX, C. J., 62 South. 945.