[No. 33629. Department One. April 4, 1957.]

LILLIAN JOHNSON, *Appellant,* v. WALDEMAR NASI, *as Administrator, Respondent.*[1]

[1]Reported in 309 P. (2d) 380.

*Fred M. Bond* and *James E. Duree,* for appellant.

*Stark & Hill,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment of dismissal in an action for compensation for services rendered to a deceased person, entered at the close of plaintiff's case.

Paragraph IV of the complaint alleged:

"That from and after the 1st day of January 1945 up to and including the 31st of December 1949 a period of five years, said deceased did enter and occupy the home and premises of the plaintiff at Naselle, Washington, and at said time lived in her home during said five years, and during said five years the plaintiff did furnish and deliver to said deceased at his request, board and lodging, also did his washing and ironing, made his beds, nursed him when he was sick and took care of him in every way and paid all of the obligations, and deceased did not pay for any of said items of expense, but did promise he would pay her and pay her well as soon as he was able to, and if he did not pay it, she would get his money when he died by giving it to her by making his will or whatever was necessary."

The complaint then alleged that on January 1, 1950, the deceased moved into a house acquired by him, and that the

claimant moved in with him; that at his request she performed services for him similar to the services alleged in paragraph IV, up to the time of his death on September 30, 1954; that he repeatedly promised to pay her for her services; that the reasonable value of her services was two dollars per day, or a total of $6,350; and that she timely filed a claim against the estate, which was rejected. She prayed for judgment in the sum of $6,350, together with interest at six per cent per annum from September 30, 1954.

Defendant answered, denying the allegations of services rendered and of promises to pay.

Mrs. Johnson was fifty-six years old at the time of trial. She had been married, but was divorced in 1940. She had two children by that marriage and two by a former marriage. She testified that she had known Oscar Nasi since 1940, when she moved to Pacific county, and that she knew his mother very well; that she had taken care of his mother many times.

According to her testimony, Oscar Nasi came to live at her house (called the Coback house) in the latter part of December, 1945. At that time, she was furnishing board and lodging to others. He stayed there four years. She testified that he had a bedroom upstairs and that she performed the services alleged in the complaint; that she performed the same services in his own home; that during the time she was living in his home, he was ill and in bed about half the time; and that she took care of him; also that during that period she bought the groceries with her own funds. Her testimony as to services rendered was corroborated by friends and relatives who visited her.

She testified under cross-examination:

"Q. Were there any other people who boarded and roomed at the Coback house? A. Yes. I had construction men about—sometimes there would be more or less. Maybe up to eight people. Eight other men. Q. You remember any of them? A. Well, I couldn't remember right off the bat. I used to call them by their first names. I did have books but they were all totally destroyed. Q. And what were you—strike that. You were running a boarding and room-

ing place, is that right, for construction workers? A. At that time, yes. Q. What period did that cover that you were running a boarding and rooming house? A. Oh, I'd say maybe about three months. Q. Three months? A. About three months, you know, coming and going. Working on the road, the men don't work long on the construction. Q. You mean just three months during this period? A. I had a boarder on these dates besides, Gilbert Erickson. A logger. Q. Did those fellows pay you for their board. A. Yes, they all paid their board and room."

She also testified, under cross-examination, that when she left the Coback house in 1949, she went to live with her daughter in Grays River for three or four months, then with her at Naselle for a couple of months, after which she moved into Oscar's house; also, that during the summer of 1949 she took care of her mother in Seattle; and that, during the period from 1945 to 1949, she would go to Portland for the summer and do housework. She testified that in 1953 she stayed in Portland for three months, but that Oscar went with her. According to her testimony, she received, between 1951 and 1954, $49 a month from the Pacific county welfare department, also $20 a month alimony.

It is not clear from the record as to the exact relationship between Mrs. Johnson and Mr. Nasi during all of this time, although it is evident that they were quite friendly.

At the time of Mr. Nasi's death, Mrs. Johnson was in possession of seven United States savings bonds issued to Mr. Nasi in November and December, 1952, and also a certificate of title to his automobile. None of these instruments was endorsed by Mr. Nasi. She testified that she received them in the latter part of 1952, or the early part of 1953. She was precluded by RCW 5.60.030 (transaction with person since deceased) from explaining the circumstances under which she obtained possession of the instruments. At any rate, upon demand she turned them over to the administrator.

Two of Mrs. Johnson's daughters and one son-in-law testified that they heard Mr. Nasi state that if anything happened to him he would leave everything to Mrs. Johnson in payment for what she had done for him.

At the close of plaintiff's case, the defendant moved for a nonsuit. The motion was granted, and judgment of dismissal was entered. This appeal follows.

We find no merit in appellant's assignments of error concerning the admission of, and the striking of, certain testimony. The sole issue is whether or not, under the evidence, appellant made out a sufficient case to be submitted to the jury.

A challenge to the sufficiency of the evidence or motion for a nonsuit admits the truth of the evidence of the party against whom the challenge is made, and all inferences reasonably to be drawn therefrom. It requires the evidence to be interpreted most strongly against the moving party, and in the light most favorable to the opposing party. *Hardung v. Green,* 40 Wn. (2d) 595, 244 P. (2d) 1163.

The burden of proving a contract, whether express or implied, is on the party asserting it, and he must prove each essential fact, including the existence of a mutual intention. *Ross v. Raymer,* 32 Wn. (2d) 128, 201 P. (2d) 129.

A party seeking to establish a claim against an estate for services rendered to the decedent during his or her lifetime has the burden of proving a contract, express or implied, to pay for the services; and the evidence to support such claim must be clear, cogent, and convincing. *Ross v. Raymer, supra.*

An implied contract is an agreement depending for its existence on some act or conduct of the party sought to be charged and arising by implication from circumstances which, according to common understanding, show a mutual intention on the part of the parties to contract with each other. The services must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and that the recipient expected, or should have expected, to pay for them. *Ross v. Raymer, supra.*

An implied contract or mutual understanding to pay for services rendered is not established in the absence of particular facts indicating such mutual understanding, where the claim is stale, the services extended over a considerable

period, and no demand for compensation was made during the decedent's lifetime, even though the services were rendered in the hope of being remembered in decedent's will. *Kremmel v. Schnaufer*, 4 Wn. (2d) 242, 103 P. (2d) 38.

In 34 C. J. S. 105, Executors and Administrators, § 370 f., it is stated:

*"Failure to demand payment during decedent's lifetime* will not necessarily defeat a claim against his estate for meritorious and valuable services performed at his request, and so where services are rendered in the first instance with the expectation of payment, but claimant refrains from presenting the claim in the expectation of receiving a legacy, he may still recover for his services, if such expectation is disappointed. However, a claim withheld, or not made or presented, until after the death of the person to whom the services were rendered is viewed with suspicion, or at least is not favored; the presumption obtains that payment was made or that it was not intended to demand payment; and evidence to establish the claim must be other than mere loose declarations, and must clearly and distinctly establish a contract between claimant and decedent."

We appreciate the difficulty with which a claimant is confronted in attempting to prove a right to be recompensed by an estate for services rendered to a decedent during his lifetime, especially in view of RCW 5.60.030, *supra*. Nevertheless, the above rules are necessary to protect estates from false claims, even though the rules might, in some instances, effect harsh results.

█ Interpreting the evidence most strongly against the respondent and in the light most favorable to appellant, we do not find, from the record, that Mrs. Johnson produced clear, cogent, and convincing evidence of facts and circumstances indicating a mutual understanding between Mrs. Johnson and Mr. Nasi that she would render services to him for which he would pay, and for which she would be paid.

The judgment is affirmed.

DONWORTH, FINLEY, and ROSELLINI, JJ., concur.

HILL, C. J. (concurring in the result)—I concur in the result, but not in the statement regarding the necessity of

RCW 5.60.030. In my opinion it should be greatly modified, but until it is so modified, it is the law.

May 21, 1957. Petition for rehearing denied.