Roy HENDRICKS, as Administrator of and Claimant in the Estate of Mable C. Hendricks, Deceased, Appellant,

v.

KNIK SUPPLY, INC., Claimant in the Estate of Mable C. Hendricks, Deceased, Appellee.

No. 1894.

Supreme Court of Alaska.

May 22, 1974.

**544**

C. R. Kennelly, Anchorage, for appellant.

William H. Jacobs, Anchorage, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN, and BOOCHEVER, JJ.

BOOCHEVER, Justice.

This appeal concerns the proper interpretation to be accorded a property settlement agreement entered into between appellant Roy Hendricks and his former wife, Mable Hendricks. The Hendricks were divorced on December 12, 1967. Roy testified that at that time he obtained certain real property owned by the parties, and Mable received $10,000 in bonds and $10,000 in cash. She later requested a different settlement whereby she would have the real property and Roy would receive the personalty. Under the terms of a document dated March 1, 1968, appellant conveyed to Mable several parcels of real property; in return, Mable relinquished certain rights in personal property (as will be set out with more particularity below). On the same date, Mable executed her will, naming her stepson, Wilbert Hendricks, sole heir of her estate.

Mable Hendricks died on October 3, 1969. The appellant promptly filed a claim against her estate, asserting that a Chevrolet stationwagon, a coin collection, and other miscellaneous items of personalty belonged to him under the terms of the property settlement agreement. Upon rejection of his claim by the executor, First National Bank of Anchorage, appellant in April of 1970 filed a petition for relief in the superior court, and in June 1970 formally instituted suit. That case was settled on October 14, 1971, upon release of the vehicle and coin collection to the appellant.

On March 15, 1971 Roy Hendricks filed a second creditor's claim against the estate. In it he asserted for the first time right to ownership of three $1,000 Series E United States Savings Bonds of the estate [1] and to the value of four other Series E bonds which were not among the estate's assets. Finally, on January 14, 1972, Hendricks filed yet another claim (superceding the second claim) for $15,000, alleging entitlement to the value of the aforementioned bonds, Mable's bank account, and other unspecified items which he alleged were to have been transferred to him prior to Mable's death.

Meanwhile, Wilbert Hendricks was occupying himself assigning away his inheritance. He made two assignments to the First National Bank of Anchorage to secure notes in the sums of $3,726.87 and $1,000.00 on April 24, 1970 and May 6, 1970, respectively; he assigned his interest in the estate's real property to appellee Knik Supply, Inc. on June 27, 1970, in exchange for a cancellation of indebtedness; and on March 5, 1971 he assigned his entire interest in the estate to Roy Hendricks, purportedly as consideration for Roy's support of Wilbert's minor son Tony Eugene Hendricks. The assignments to the bank were discharged under the terms of the aforementioned October 14, 1971 agreement, under which the bank was allowed to withdraw $3,903.96 and to pay its attorney $1,500.00 out of the estate. The final assignment to Roy was considered immaterial to the validity of Knik's prior assignment, and its validity has not been asserted on review.

To complete the dramatis personae, Wilbert's former wife, Patricia Hendricks Gardner, filed a motion in superior court

---

1. The bonds were in Mable Hendricks' name.

on December 20, 1970 charging that Wilbert was in arrears in his child support payments, and requesting that the estate assets not be distributed. Although the record is unclear, apparently no hearing on the motion ever took place. Since Mrs. Gardner is not a party to this appeal, we do not consider that claim on this appeal.

On April 28, 1972, appellant petitioned the court for permission to sell the real property in order to satisfy his claims against the estate. Knik Supply resisted the motion. A hearing was held on August 4, 1972, at which time the superior court resolved the controversy by disallowing in its entirety appellant's claim against the Mable Hendricks' estate and upholding appellee's claim to the real property. From that judgment, Roy Hendricks appeals.

If Roy's claim against the estate is valid, it would be necessary to sell the real estate, since otherwise there would be insufficient assets in the estate with which to pay the claim. Knik's interest, as assignee of the heir to the estate, is subordinate to that of a creditor having a valid claim against the estate. Accordingly, disposition of this appeal is dependent upon the correctness of the trial court's decision in disallowing Roy's claim.

That claim was based on the agreement entered into between Roy and Mable on March 1, 1968 which in its material portions provided:

1. Roy Hendricks shall and does hereby agree to convey the following real estate to Mable C. Hendricks for use as her own and to do with as she sees fit

[a description of two parcels of real property is omitted]

2. As consideration for the transfer of Real Estate shown in paragraph # 1 above, and acknowledging that the real estate is valued at approximately $12,000, and hereby declaring that other consideration has been received by Mable C. Hendricks, the *said Mable C. Hendricks does hereby disclaim any interest she has or may have in any property owned by Roy Hendricks, or acquired by him during the marriage of the parties, and specifically disclaiming any and all interest in the following*:

(a) Inventory and business known as the Thrift and Trade Mart.

(b) All vehicles owned separately or jointly by the parties up to December 12, 1967.

(c) Coin collection acquired by the parties.

(d) All *cash and other personalty owned by either or both of the parties.*

3. It is mutually agreed that each party hereby waives any interest to any property acquired after December 12, 1967, and that all the property, unless otherwise disposed of as hereinabove set forth, shall be disposed of by the respective party having possession, and the other party shall make no claim thereby.

4. From this day forward the parties agree that neither has any right to inherit from the other, nor in any way interfere with each other, both parties acknowledging that each has been fully satisfied as to any claim each has or may have against the other. [Emphasis added].

It is difficult to reconcile the body of paragraph 2 of the agreement with subparagraph (d). First, Mable disclaimed any interest in property owned by Roy or acquired by him during the marriage. Then, by subparagraph (d), she specifically disclaimed any interest in "cash and other personalty owned by either or both of the parties." This latter specific disclaimer, which would appear to modify the original disclaimer to property owned by Roy, is in fact broader than the clause it attempts to delineate. It includes cash and other personalty owned by Mable or both parties in addition to that owned by Roy. Construction is further complicated by the fact that Mable did not "grant, transfer or assign" any property to Roy but merely "disclaimed any interest" she had in the property. Moreover, each of the parties

waived any interest in property acquired by the other after December 12, 1967.

At the time of Mable's death, she possessed in her name three $1,000 bonds which had been acquired prior to December 12, 1967. By the literal wording of the March 1, 1968 agreement, Mable did not purport to transfer those bonds to anyone but did disclaim any interest in them. However, the agreement did not specifically refer to the bonds, although mention was made of the Thrift and Trade Mart property, the vehicles and coin collection. The trial court, initially at the request of Roy's counsel, permitted testimony to be introduced as to the intent of the parties.

When confronted with ambiguous clauses of a written agreement, a court must turn to that incorporeal essence of all consensual arrangements—the intent of the parties—to resolve any controversy arising from the uncertainty. Contractual agreements afflicted with an ambiguity are always to be interpreted in accordance with the understanding of the parties. In four prior decisions, we applied the rule that where the terms of a contract are ambiguous or uncertain:

> [Intent] may be ascertained from the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated.[2]

The Hendricks agreement is sufficiently puzzling to require resort to such means for ascertaining the parties' intent.

After hearing testimony and observing the demeanor of witnesses, the trial judge in his written opinion found that the agreement merely contained a disclaimer by Mrs. Hendricks as to the items referred to in subparagraph (d) and that "to read the subparagraph as a promise by Mable C. Hendricks to deliver any property in her possession to Roy Hendricks is to misread the agreement."[3] The court thus concluded that Roy was not entitled to the three bonds that were in the decedent's possession at the time of her death.

In reaching its conclusion, the court was influenced by the fact that there was no specific mention of the bonds in the agreement, and that neither Roy nor the attorney who drafted the agreement could furnish any adequate explanation as to why the bonds were not mentioned if they were intended to be transferred to Roy. Consideration was given to the fact that although Roy alleged that he attempted diligently to secure the property, he took no legal action to reclaim it during the 19 months that decedent remained alive after signing the agreement.[4] Also, Roy's original claim filed shortly after decedent's death requested only the vehicle, the coin collection, some film and a dog registration statement. It was not until a year and a half after decedent's death that Roy filed his first claim contending that he was entitled to the three bonds and the value of four other $1,000 bonds which he claimed to have been in Mrs. Hendricks' possession on March 1, 1968.[5]

2. Smalley v. Juneau Clinic Building Corp., 493 P.2d 1296, 1305 (Alaska 1972); Alaska Placer Co. v. Lee, 455 P.2d 218, 221 (Alaska 1969); Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968); Pepsi Cola Bottling Co. v. New Hampshire Ins. Co., 407 P.2d 1009, 1013 (Alaska 1965).

3. It is difficult to understand what was intended by the disclaimer of Mable's interest in "cash and other personalty owned by either or both of the parties." While normally we would consider it overly technical to distinguish between the use of the term "disclaim" and "grant, transfer or assign", it is almost certain that Mrs. Hendricks did not intend literally to convey all of her personalty (in-

cluding clothing, etc.) and cash to Mr. Hendricks. There was thus reason for the trial court to differentiate between the terms.

4. In assessing the validity of a claim against an estate, the trier of fact may consider the failure of the claimant to demand satisfaction during the life of the deceased where a reasonable opportunity to make such a demand existed. Johnson v. Nasi, 50 Wash.2d 778, 309 P.2d 380, 383 (1957).

5. A delay of nine months while the estate was being probated has been held sufficient to cast "serious doubts upon the integrity of the claim." In re Shirk's Estate, 194 Kan. 424, 399 P.2d 850, 859 (Kan.1965) reh. denied, 194 Kan. 671, 401 P.2d 279 (Kan.1965).

In the dissent to this opinion, it is contended that the word "cash" is unambiguous and, under an objective interpretation, should be construed to include the contested bank account and bonds, without allowing parol evidence on the question of what the parties intended the word to mean. We note initially that the dissent itself relies on extrinsic evidence as to the extensive negotiations which took place. There is further reference to the fact that the disputed language was "intended to settle a specific dispute", which again we assume refers to extrinsic testimony. While Justice Erwin's dissent asserts that the word "cash" unequivocally included U. S. Savings Bonds, we note that the American Heritage Dictionary[6] defines the term so as to embrace only money, currency and coin, and payment for goods or services in money or by check. Such a definition does not clearly encompass savings bonds. We further note that there are cases which specifically hold savings bonds not to be included within the definition of the word "cash".[7]

Regardless of the merits of the dissent's treatment of the word "cash", we cannot believe that the term "personalty" is to be interpreted literally. To do so would mean that by entering into the March 1, 1968 agreement, Mable was relinquishing ownership of every item of her personal property, including her utensils, her jewelry and even the very garments she was wearing at the time she signed the agreement. Moreover, the dissent fails to discuss the ambiguity involved in the language by which Mable Hendricks "does hereby disclaim any interest". In the context of the agreement, it is difficult to determine the meaning of the disclaimer language. Such a loosely-drafted agreement as we are confronted with here requires parol evidence to make it comprehensible.

 We find that the agreement of March 1, 1968 was ambiguous. Its interpretation is thus dependent upon oral testimony. Since the effect of the testimony was dependent upon issues of credibility and the inferences to be drawn from the statements made, a finding of a trial court based on such testimony will not be overturned unless clearly erroneous.[8] Roy had the burden of proving his claim by clear, cogent and convincing evidence.[9] We hold that the trial court did not err in holding that he did not meet that burden with reference to the three bonds in Mrs. Hendricks' possession at the time of her death.[10] Roy's claim to the proceeds of the four

In his dissent, Justice Erwin questions the evidentiary weight the trial court placed upon the fact that Roy did not assert any claim against the estate until 19 months after Mable's death. But it is well-recognized that where there is an ambiguity in a contractual agreement, the plaintiff's failure to institute a claim in timely fashion is of evidentiary value in properly construing the agreement. See Montgomery v. Kalak Water Co. of New York, 196 F.Supp. 173, 176 (S.D.N.Y.1961); Motor Terminals v. National Car Co., 92 F. Supp. 155, 163 (Del.1949); Ricketson v. Girtman, 222 La. 576, 63 So.2d 1 (La. 1953).

6. American Heritage Dictionary of the English Language (Houghton Mifflin Co. 1969). See Webster's New International Dictionary of the English Language (2nd ed., unabridged, 1960).

7. Ferguson v. American Sav. Stamp Co., 194 Kan. 297, 398 P.2d 1011, 1015 (Kan.1965); In re Keel's Estate, 37 N.M. 569, 25 P.2d 806 (N.M.1933); McCulloch v. McCulloch, 232 Ark. 413, 337 S.W.2d 870, 871 (Ark.

1960) (not included within the term "cash", but savings bonds were held to be "personal property" under the terms of a will).

8. Alaska Placer Co. v. Lee, 455 P.2d 218, 224 (Alaska 1969); cf. Smalley v. Juneau Clinic Building Corp., 493 P.2d 1296, 1305 (Alaska 1972).

9. In re Brown's Estate, 189 Kan. 193, 368 P. 2d 27, 32 (Kan.1962); Johnson v. Nasi, 50 Wash.2d 87, 309 P.2d 380, 383 (Wash.1957). The Brown case is especially persuasive since it involved construction and execution of a written antenuptial property agreement. Cf. In re Hewett's Estate, 358 P.2d 579, 584 (Alaska 1961).

10. Our dissenting colleague further suggests that, if we consider parol evidence, we should reverse because the testimony of Hendricks and the attorney who drafted the agreement demonstrated an intention of the parties to include the bonds. The excerpts from the opinion of the trial court quoted below indicate that the court was fully aware of the testimony upon which Justice Erwin would

other bonds is disposed of by the same considerations.

The court found that there was no evidence that the bank account of decedent claimed in the third or amended claim was not established after December 12, 1967. We hold that such finding is not clearly erroneous, and since both partners waived any interest in property of the other acquired after that date, we affirm the court's denial of that claim.

Affirmed.

FITZGERALD, J., not participating.

ERWIN, Justice (dissenting).

I am unable to agree with my colleagues' interpretation of Alaska's parol evidence rule and its application in this case.[1] I am also unable to accept their views regarding the effect of Roy's delay in filing his claim for the bank account and bonds.

We purport to follow the objective theory of contract interpretation which we adopted in Pepsi Cola Bottling Co. of Anchorage v. New Hampshire Insurance Co.,[2] strayed from in Alaska Placer Co. v. Lee,[3] and apparently returned to in Smalley v. Juneau Clinic Building Corp.[4] Under this theory, a court interpreting a fully integrated written contract must first objectively ascertain whether the terms of the contract are clear and unambiguous. If they are, the respective obligations of the parties must be determined from the language of the contract alone. Only if the contract is unclear or ambiguous may parol evidence be admitted to determine the intent of the parties.[5]

Applying this theory, I do not find the disputed phrase "cash and other personalty owned by either or both of the parties"[6] to be ambiguous or unclear. The word "cash" has a well-established legal meaning

---

rely, and discredited it for reasons of demeanor and because of other testimony and evidence in the record. Although we might have decided the case differently from the trial bench, we cannot say that the trial court clearly erred in its assessment of the credibility of the witnesses. The trial judge stated:

> It is my opinion, and I so rule, that the claimant, Roy Hendricks, has the burden of proving by a fair preponderance of the evidence the validity of his amended claim here in issue. I have thoroughly and carefully considered the agreement . . . and the testimony of Roy Hendricks, claimant, and of [the attorney who drafted the agreement] at the hearing held on August 4, 1972, together with the exhibits admitted at that hearing. . . . Among other things I had the opportunity of observing the claimant Roy Hendricks as he testified on direct examination and on cross-examination.
>
> It is my opinion, and I so rule, that claimant Roy Hendricks has not met his burden of proof with reference to his amended claim. . . .

At the hearing on August 4, 1972, claimant Roy Hendricks was asked specifically as to why, if subparagraph (d) meant the bonds of which everybody was aware, that paragraph did not mention bonds specifically. His answer was that "he did not know." When [the attorney] was asked the same question his answer was that "he couldn't explain that, that he just couldn't recall it."

1. See Erwin, Parol Evidence or not Parol Evidence in Alaska, 8 Alaska L.J. 20 (1970).

2. 407 P.2d 1009, 1013 (Alaska 1965). See Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968).

3. 455 P.2d 218, 221 (Alaska 1969).

4. 493 P.2d 1296, 1305 (Alaska 1969). See my concurring opinion, id. at 1305.

5. The objective theory of contracts is set out in the Restatement of Contracts §§ 229–31, 237–38 (1932) and explained in detail in 4 S. Williston, The Law of Contracts §§ 600–01, 609–10 (3d ed. W. Jaeger 1961).

6. The disputed portion of the agreement states:

> As consideration for the transfer of Real Estate shown in paragraph # 1 above, and acknowledging that the real estate is valued at approximately $12,000, and hereby declaring that other consideration has been received by Mable C. Hendricks, the said Mable C. Hendricks does hereby disclaim any interest she has or may have in any property owned by Roy Hendricks, or acquired by him during the marriage of the parties, and specifically disclaiming any and all interest in the following:
>
> (a) Inventory and business known as the Thrift and Trade Mart.
>
> (b) All vehicles owned separately or jointly by the parties up to December 12, 1967.
>
> (c) Coin collection acquired by the parties.
>
> (d) All *cash and other personalty owned by either or both of the parties.* (emphasis added)

—"money or its equivalent"[7]—and has been construed to include bank deposits,[8] commercial paper,[9] bank bills,[10] and even United States bonds.[11] Thus, it is difficult to conceive why under an objective interpretation the word "cash" should not be construed to include the contested bank account and bonds without allowing parol evidence on the question of what the parties intended the word to mean.

That the language in question was agreed upon only after negotiations aimed at settling the Hendricks' property dispute also influences my view that the word "cash" should be construed to include the bank account and bonds.[12] In Oxford Commercial Corp. v. Landau[13] the New York Court of Appeals emphasized the extensive negotiations preceding plaintiff's written agreement not to sue in refusing to permit parol evidence on the issue of

whether defendant was excluded from the effect of the agreement:

In the case before us, the plaintiff's agreement not to sue "any person whomsoever" except those specifically named is too clear and precise to admit of evidence that the parties intended to exclude defendants from this all-inclusive category. . . . In sum, the plaintiff corporation's promise, contained in an integrated agreement reached after lawyer-guided negotiations and containing provisions quite unlike the stereotyped verbiage found in the usual standard general release, permits no conclusion other than that the plaintiff intended to release everyone who participated in the Carlin transactions except the parties expressly excluded.[14]

The import of prior negotiations aimed at solving a specific dispute is also illustrated in Birchcrest Building Co. v. Plaskove,[15]

7. Black's Law Dictionary 272 (4th ed. rev. 1968). *Compare* Webster's New International Dictionary 415 (2d ed. 1960), which defines "cash" when used "strictly" in a commercial sense as "coin or specie," and when used "less strictly" in a commercial sense as "bank notes, sight drafts, or demand deposits at a bank."

8. *E. g.*, In re Feist's Will, 170 Misc. 497, 10 N.Y.S.2d 506, 508 (Sur.Ct.1939).

9. *E. g.*, Commercial Credit Corp. v. Third & Lafayette St. Garage, 131 Misc. 786, 228 N.Y.S. 166, 167–68 (Sup.Ct.1928).

10. *E. g.*, Dunlap v. Whitmer, 133 La. 317, 62 So. 938, 943–44 (La.1913).

11. *E. g.*, Baldwin v. Baldwin, 107 N.J.Eq. 91, 151 A. 741, 742 (N.J.Ch.1930).

12. The majority observes that I myself rely upon extrinsic evidence regarding the negotiated settlement of the Hendricks' property dispute. Their observation is misplaced. The preamble to the agreement in question clearly indicates the nature and origin of the dispute and the parties' desire that the agreement finally settle it:

WHEREAS, Roy Hendricks and Mable C. Hendricks have resolved their differences arising out of matrimony, said terminated on the 12th day of December 1967, by divorce . . . and

WHEREAS, certain property matters remain unresolved, although appearing to have

been settled, and both parties wish to terminate all claims each might have on property or properties belonging to each other.

However, even assuming, *arguendo*, that I rely upon extrinsic evidence, this tack would not be inconsistent with an objective interpretation of the settlement agreement. Professor Williston, a leading proponent of the objective theory of contract interpretation, has stated:

[The parol evidence] rule is subject to three exceptions:

. . . . .

(2) If the words of the writing will express equally well the intention shown by the oral negotiations, and another intention. The negotiations may be used to show the actual intention of the parties not to subject them to a contract not expressed in the writing, but to show that the words of the writing bear a particular meaning. 4 S. Williston, The Law of Contracts § 630, at 947–48 (3d ed. W. Jaeger 1961) (footnotes omitted).

13. 12 N.Y.2d 362, 239 N.Y.S.2d 865, 190 N.E. 2d 230 (N.Y.1963).

14. *Id.* at 231–232, 239 N.Y.S.2d at 867, 190 N.E.2d at 231 (citations omitted).

15. 369 Mich. 631, 120 N.W.2d 819, 823 (Mich.1963).

where the Supreme Court of Michigan emphasized prior discussions culminating in a written agreement in holding that parol evidence was inadmissible to reform the agreement.

In the present case the disputed language is clear, has a well-established meaning, and was intended to settle a specific dispute. The admission of parol evidence for the purpose of ascertaining what the parties intended the language to mean is a retreat from the prior Alaska cases adopting the objective theory of contract interpretation.[16]

I would find that appellant is entitled to the three $1,000 bonds because it was established that they existed at the time of Mable's death. However, I believe that the absence of proof regarding the existence of the bank account and the four additional bonds should prevent appellant from recovering them.

My colleagues further note that Roy did not file his claim for the bonds until a year and a half after Mable's death and imply that Roy's delay casts a serious doubt on the integrity of his claim.[17] I find no legal obligation under the probate code, either past[18] or present,[19] to promptly file a claim against an estate and note only a 3-year statute of limitations establishing a time limit on the validity of a claim.[20] It would be unfortunate for this case to be read as precedent for the view that claims filed within the statute of limitations become presumptively invalid as they approach the statutory limit unless the claimant proves satisfactory reasons for his delay. We have attached no such condition to statutes of limitations in other fields,[21] and I do not perceive any public policy for doing so in this area.

There are as many valid reasons for a divorced spouse to delay filing claims against her former spouse, either before or after her demise, as there are invalid ones

16. Even assuming that parol evidence on the parties' intent was properly admissible to aid interpretation of the disputed phrase, as the majority contends, I disagree with the trial court's evaluation of it. It is clear from the testimony of the attorney who represented both parties and drafted the agreement in question that the disputed bonds were intended to be included within the scope of the agreement:

Q At the time that the document was prepared, were you aware of the fact that there were certain bonds that Mrs. Hendricks was holding or that she had in her possession?
A Yes.
Q And was it your understanding from the ——when you made that agreement up, and from the instructions of Mrs. Hendricks and Mr. Hendricks that that was part of the property that she was to return to Mr. Hendricks under that agreement?
A As I recall it, it was all the property that had changed hands at the time of the divorce; it was again changing hands, including bonds and vehicles and everything else that were involved.
Q So, if she had any bonds that they had obtained during the time of their marriage, they were to be returned to——or given to Mr. Hendricks under that agreement?
A Yes.
Roy's testimony was to the same effect. In response to an inquiry concerning the events surrounding the final settlement, he stated:

A . . . [A]t that time she made the final settlement . . . [she] agreed that she would turn all of my bonds back.
Q Is that when she made this final property settlement and agreed to turn all personal property back to you?
A That is correct.
Q And did that personal property include these bonds that you've been claiming here?
A Yes, it did . . . .
Since Roy and the attorney were the only two witnesses who testified as to the intent of the parties, I would find the trial court's determination with respect to the three $1,000 bonds to be clearly erroneous. Alaska Placer Co. v. Lee, 455 P.2d 218, 224 (Alaska 1969); Alaska R.Civ.P. 52(a).

17. Notes 5 and 6 of the majority opinion *supra.*

18. ACLA § 61-13-2 (1949) (repealed 1973).

19. AS 13.16.455, 13.16.460.

20. AS 13.16.460(a)(2).

21. Sinka v. Northern Commercial Co., 491 P.2d 116 (Alaska 1971); Austin v. Fulton Ins. Co., 444 P.2d 536 (Alaska 1968); Silverton v. Marler, 389 P.2d 3 (Alaska 1964).

—not the least of which is a desire for some tranquility, particularly where an initial attempt at a fair distribution of the marital property has gone awry. I would thus attach no legal significance to a delay in filing or amending claims once it is established that there are assets to pay for them.[22]

I would reverse the decision of the superior court.

22. I would further limit the discussion of the claims in the majority opinion by disclaiming any intention to suggest that prompt filing of a claim is always necessary to recovery, for there are equitable interests which are not barred by the statute of limitations. *See* Geist v. O'Connor, 92 F.Supp. 451, 458–459, 13 Alaska 15, 30–31 (D.C.1950); Comment, Equitable Claims Against Estates: Probate Jurisdiction and Statute of Limitations, 5 St. Louis U.L.J. 578 (1958).