358 P.2d 579 (1961)
In the Matter of the ESTATE of James R. HEWETT, Deceased.
Nellie B. HEWETT, Appellant,
v.
Grace E. DALY, Appellee.
No. 33.
Supreme Court of Alaska.
January 10, 1961.
*580 Albert Maffei, Anchorage, George W. Young, Spokane, Wash., for appellant.
Gordon Hartlieb, Anchorage, for appellee.
Before NESBETT, C.J., and DIMOND and AREND, JJ.
DIMOND, Justice.
James Hewett died at Anchorage, Alaska, on August 12, 1955. In his last will and testament, executed in 1952, he made specific bequests of $1 each to two brothers and five sisters. The remainder of his estate was left to a friend, Grace Daly, who was named as executrix. She was also a creditor of the estate, having filed a claim in the amount of $11,175 representing board and room furnished Hewett at various times between 1949 and 1955.
Hewett's wife, Nellie, from whom he had been estranged since 1938, was not mentioned in his will. She filed her petition in the probate court for what is commonly known as a "widow's allowance", under the provisions of Section 61-12-2 A.C.L.A. 1949.[1] The petition was denied by the probate court. On appeal the district court affirmed, finding that 
"* * * case law is almost unanimous that married people who separate without making claims on each other and the wife who re-marries without ascertaining the status of her former marriage is not a widow under the widow's award statute."
From that decision an appeal was taken to this court. There are three questions presented  the principal one being whether Hewett's wife was a "widow" within the meaning of Section 61-12-2.

1. Widow's Allowance.

The relevant statutory provisions are contained in that portion of the probate code dealing with "Support of the Family."[2] Section 61-12-1 provides that pending administration of the estate and the filing of the inventory, the widow and minor children are entitled to remain in possession of the homestead, all family wearing apparel and household furniture, and 
"* * * to have a reasonable provision allowed for their support during such period * * *" (emphasis added).
Section 61-12-2[3] provides that the property set apart to the surviving widow or minor children shall be decree to be her property 

*581 "* * * to be used and expended by her for the maintenance of herself and the minor children * * *" (emphasis added).
Section 61-12-3 permits the probate court to make, in addition to the $4,000 award under Section 61-12-2, such further reasonable allowance out of the estate 
"* * * as may be necessary for the maintenance of the widow and minor children, according to their circumstances and condition in life, during the progress of the settlement of the estate, * * *" (emphasis added).
These sections of the law, read together, disclose the motivating thought: that of support and maintenance of the widow and children. To provide by legislative act that there will be support from the decedent's estate suggests that the decedent, at the time of his death, had been rendering support; or if not, that he then had the obligation to do so. Thus, it is reasonable to find in the statute the objective of continuing, after death, the support which a widow had been receiving, or to then afford her the support to which she had been entitled but which her husband, in violation of his obligations, had failed to provide. It follows logically that if no support were being furnished at the time of death, and if there were then no obligation to render support, the surviving spouse is not a widow qualified to receive the statutory allowance.[4]
The evidence shows that Hewett's wife had not received any support from him for approximately seventeen years prior to his death. It also discloses in a convincing fashion that she had no right to such support before he died.
The duty of a husband to support his wife, implicitly recognized in the widow's allowance statute, is stated elsewhere by way of imposition of sanction for the failure to render support. Section 65-8-1, ACLA 1949 provides that a person shall be guilty of a misdemeanor if, without lawful justification, he wailfully abandons and leaves his wife or neglects to provide her with necessary food, clothing, shelter, or medical attendance.
James and Nellie Hewett were married in 1920. They lived together until 1938. The circumstances of their separation, which occurred that year, were explained by Mrs. Hewett. She testified:
"Mr. Hewett was working on various jobs and was unemployed a greater part of the time. I was required to work in order to support myself and to a great extent, to support him. I was continuously paying bills which he incurred, and we gradually drifted apart."
This is the only evidence showing why they separated. Had the separation taken place in Alaska, it would not be sufficient to show a "wilful abandonment" by Hewett in violation of Section 65-8-1.
The parties were not divorced. But the separation in 1938 was permanent, and so far as the record shows the first time that Nellie Hewett saw her husband after 1938 was at his funeral in August 1955. The evidence also shows that Nellie Hewett's only attempts to contact her husband after the 1938 separation were during the years 1945 to 1947. In this period she testified that she wrote at least five letters to Hewett addressed to the Grand Coulee Hotel, Spokane, Washington. She stated that two letters were returned to her marked "Deceased". She offered no explanation as to the significance of the other three letters not having been returned, nor did she state what purpose she had in writing.
She then testified that in the spring of 1947 she went to Spokane and called at the Grand Coulee Hotel. There she was informed by a woman who identified herself as a housekeeper of the hotel that Hewett had died in Alaska. Apparently, no further effort was made by Mrs. Hewett to verify that Hewett had died, and in October 1947 she married Ernest Hawks in New York City. She testified that she did this believing *582 Hewett to be dead, and that she did not learn that he was then still alive until notified by Hewett's sister in August 1955 that he had died that month in Alaska.
The fact that a woman is apart from her husband and that he does not support her during the separation would not, in itself, relieve him from the duty to continue to support her during marriage.[5] But when this fact is coupled with other matters as exist in this case, the result is different.
The separation in 1938 indicates no particular fault on the part of Hewett. As Mrs. Hewett testified, they "gradually drifted apart". From that time until Hewett's death in 1955 Nellie Hewett made no effort to obtain assistance from her husband. She did not state the reason for writing him the five letters between 1945 and 1947, as she could have done had the purpose been to seek financial aid. She offered no explanation for her personal visit to the Grand Coulee Hotel in the spring of 1947; but since she was married to Hawks that fall it may be inferred that her personal inquiry as to Hewett's whereabouts was in relation to her desire to remarry. Certainly there is nothing to indicate that she was seeking support from Hewett. Particularly is this true when the record is void of any evidence showing that her investigation into the supposed death of her husband was anything but cursory. Apparently she did nothing further to verify the alleged death, made no inquiries as to when and how it had occurred, and was not interested in ascertaining whether Hewett had left an estate from which she might have received financial benefit.
All of these facts taken together show that if there had existed a duty on Hewett's part in 1938 to support his wife, that duty ceased to exist prior to his death in 1955. Nellie Hewett had waived or abandoned her right to demand support from her husband. It could not be said that after Hewett moved to Alaska he had, "without lawful justification", failed to provide his wife with "necessary food, clothing, shelter or medical attendance."[6]
Therefore, since at the time of Hewett's death Nellie Hewett was neither receiving support from her husband nor entitled to demand support of him, she is not a "widow" entitled to the award from Hewett's estate provided by Section 61-12-2 ACLA 1949.
The Alaska case of In re Harpole's Estate, 10 Alaska 193, decided by the Territorial District Court in 1942, is cited by Nellie Hewett as authority for giving her the allowance from Hewett's estate. The court said there that the statute was mandatory in making provision for the widow; that there was no provision in the statute making it necessary that the deceased and his wife be living together or that she be receiving any support from him at the time of his death; and that she was entitled to the benefit of the statute, notwithstanding the fact that she was living separate and apart from her husband and had filed suit for divorce, unless she had contracted away her right to the award. We have merely gone one step further in holding that, entirely apart from contract, the wife may also waive or abandon such right.[7]

2. Community Property.

After Hewett's death, Grace Daly received and accounted for in her administration of the estate a lump-sum Social Security payment due by reason of Hewett's death and certain sums of money representing insurance proceeds and other benefits arising from Hewett's membership in the Plumbers' Union and in the Widows' and Orphans' Fund of the El Katif Shrine Temple of Spokane, Washington. Nellie Hewett claims that the rights to these funds all were acquired, initiated and had their inception in the State of Washington during the time that she was married to Hewett, that each fund was thus the community property of Hewett and her, and *583 that under Washington law[8] her husband could dispose by will of not more than one-half of such property. Hence, she claims to be the owner of one-half of each of these funds.
In Washington there is a presumption that property acquired by either husband or wife during marriage is community property.[9] But this can be rebutted by facts more consistent with separate ownership.[10]
The concept of community property is that it is obtained by the efforts of the husband or wife, or both, for the benefit of the community.[11] That is absent here. For seventeen years neither James nor Nellie Hewett contributed to the support of the other. Each managed his individual affairs and made no accounting to the other for income received or property accumulated. She did not ask him for assistance or support She asserted no claim to any property that he acquired during this period, nor did she in any way contribute to its acquisition.
These circumstances create the strong inference that both parties recognized the separate ownership of all property acquired by each after their separation.[12] It overcomes the presumption of community ownership, at least to the extent of placing the burden on Nellie Hewett to show the contrary.[13] That showing was not made. Therefore, under the facts of this case all property acquired by either James or Nellie Hewett after the spring of 1938 was and remained the separate property of the acquiring spouse.
Hewett's interest in the Shrine Widows' and Orphans' Fund came into existence after the separation, since he did not become a member of the Shrine until 1948. Hence, Nellie Hewett had no community interest in that fund.
A lump sum death payment in the maximum amount of $255 was provided by the Old Age and Survivors Insurance portion of the Social Security Act.[14] This is payable, under the express terms of the statute, to the decedent's widow who was living with decedent at the time of his death, or if there is no such person, then to the person who has paid the burial expenses. Nellie Hewett was not living with decedent when he died, and she did not pay the expenses of burial. Thus, she was not qualified under the statute to the lump sum death payment.[15]
Nor is she entitled to any portion of it as community property. Congress has clearly specified the persons who are to receive the payment, and there is no room in the statute for making an exception under state community property laws.[16]
In her amended final account and report filed in the probate court Grace Daly showed as part of the estate inventory the sum of $3,300 received from the Plumbers' Union. She collected this money from a Union office in Anchorage, and it was her impression that Hewett had made out a card naming her as beneficiary under the Union insurance policy. She did not know the date of the policy or when Hewett had joined the Union, although she did state *584 that he had been in the Plumbers' Union "a long time." There is no other evidence that would clarify this matter, and thus there is nothing to show whether Hewett acquired an interest in the insurance prior to or after he separated from his wife in 1938.
The status of property, as community or separate, is to be determined as of the date of its acquisition.[17] Although there is a presumption that property acquired during marriage is community property, there is no presumption that its acquisition took place at any particular time, e.g., before or after the parties had separated. In the light of the long period of separation of James and Nellie Hewett and the surrounding circumstances, her burden of showing the existence of community property required her also to show, if she could, that Hewett's rights in the Plumbers' Union insurance were initiated prior to 1938. She has not done this, and therefore she has no claim to the insurance proceeds.
Hewett was a member of the Spokane, Washington, lodge of the Fraternal Order of Eagles. Under the constitution and by-laws of this organization funeral expenses in the amount of $500 were payable on Hewett's death. Section 115.3(b) of the constitution and statutes of the Eagles provides:
"In the event the funeral expenses of the deceased member have been paid from some other source, or if a balance remains after paying same, the whole amount of the funeral expense money provided or the unexpended balance shall be paid to the widow or minor children of the deceased, if any. If the deceased leaves no widow or any minor child or children surviving him, the amount may be paid to some other designated dependent, if any. If there be no widow or minor child or children or other designated dependent, the unexpended funeral expense money, if any, shall remain in the treasury of the Aerie."
This makes it clear that the primary purpose of the death benefit is for payment of funeral expenses. Grace Daly had paid $496 toward such expenses prior to receiving the Eagles' payment, and had incurred liability for the balance of $995 which was paid two months later. Hence, it is reasonable to assume that the $500 was paid to her for funeral expenses, and that this was in accordance with the constitution and by-laws of the organization. It was up to Nellie Hewett to show, if she could, that the funeral bills were paid "from some other source", within the meaning of Section 115.3(b) of the Eagles' constitution, and that as widow of the deceased she was entitled to the payment. She made no such showing, and therefore had no claim to this money.

3. Admissibility of Statements of Deceased.

In her capacity as creditor of Hewett, and not as executrix of the estate, Grace Daly filed a claim against the estate in the amount of $11,175 for board and room furnished Hewett at various times between 1949 and 1955. This claim was allowed and approved by the probate court in the order settling the final account of the executrix.
At the hearing conducted by the probate court on the executrix' final report and account, Grace Daly testified in support of her claim as follows:
"Mr. Hartlieb: Mrs. Daly tell the Judge in your own words what if any financial arrangements or understanding existed between you and Mr. Hewett as to his living quarters.
* * * * * *
"Mrs. Daly: He asked when he came up here that he was broke and that I help him until he could get to work and when he worked he got drunk and couldn't pay me anything and I had to kick him out and then he got sick and had to have a doctor for quite a while and then worked *585 for a little while and drank again and finally they sent him out.
"The Court: Limit your answer.
"Mrs. Daly: He said he would pay when he got to work.
"Mr. Hartlieb: Did he ever pay you anything?
"Mrs. Daly: No."
Nellie Hewett contends that this testimony was inadmissible on the ground that the decedent's statements do not fall within the exception to the common-law rule provided by the Alaska "deadman's statute". That statute (Section 58-6-1, ACLA 1949) reads as follows:
"Matters affecting credibility: Statements of deceased person. Neither parties nor other persons who have an interest in the event of an action or proceeding are excluded as witnesses; nor those who have been convicted of crime; nor persons on account of their opinions on matters of religious belief; although in every case, except the latter, the credibility of the witness may be drawn in question, according to the rules of the common law. When a party to a civil action or suit by or against an executor or administrator appears as a witness in his own behalf, statements of the deceased whether oral or in writing concerning the same subject may also be shown."
The statute as originally enacted in 1913[18] was comprised of only the first sentence of what now appears as Section 58-6-1. This had the effect of removing the common-law disqualification of interest, and brought two important witnesses, the plaintiff and the defendant, into the trial of almost every suit.
However, when the accident of death had withdrawn one of these witnesses, the testimony of the other gave him, as a party, an undue advantage.[19] An example of this would be where the defendant had died and the plaintiff testified as to declarations made by the defendant during his lifetime. If these statements were against the pecuniary or proprietary interest of the decedent, they would be admissible as an exception to the hearsay rule. But the personal representative of the deceased could not rebut such evidence with statements that the latter had made in his favor, because those statements would be barred by the rule against hearsay testimony. Probably for this reason the Alaska Legislature in 1931[20] added the last sentence to the existing statute. As Professor Wigmore has pointed out, the avowed purpose of such a statute was "merely to place the deceased party's case on an equal footing, in respect to sources of proof, with that of the surviving opponent."[21]
This act was construed by the late Judge Folta in the case of Murkowski v. Lien, D.C.D.Alaska 1953, 115 F. Supp. 889, 14 Alaska 450. He held that declarations of a decedent are not admissible on behalf of his personal representative in an action brought by him except in rebuttal. Thus, declarations of a decedent in his favor, not admissible under the hearsay rule, become admissible only after the one asserting the claim against the estate or defending a claim interposed against him on behalf of the estate has first testified.
In this case, however, there was no attempt to introduce statements of the decedent which would tend to defeat a claim against his estate. Grace Daly was testifying, not as executrix in favor of decedent, but as one asserting a claim against the estate. It is unnecessary, therefore, to consider the exception to the common-law rule found in the last sentence of the statute.
*586 This testimony was admissible. Grace Daly was not disqualified as a witness on account of interest.[22] The statements which she reported Hewett as having made constituted an acknowledgment of a debt which he owed to her and thus would be admissible as an exception to the hearsay rule because they were statements against Hewett's pecuniary interests. As Professor McCormick has pointed out in his work on evidence: "In respect to declarations against pecuniary interests, the clearest example is the acknowledgement that the declarant is indebted."[23] Therefore, there was no error in permitting Grace Daly to testify as she did.
The judgment of the district court is affirmed.
NOTES
[1] This statute provides in relevant part as follows:

"Award for support. After the filing of the inventory, should the deceased have died leaving a widow or minor children, the commissioner, upon such notice as may be by him fixed, upon being satisfied that the funeral expenses, expenses of last illness and of administration have been paid or provided for, and upon petition for that purpose, shall award and set off to the surviving widow or minor children property of the estate not exceeding the value of Four Thousand Dollars ($4,000.00), exclusive of any mortgage or mechanic's, laborer's, or other lien upon the property so set off, which property so set off shall include the home and household goods, if any, and all property of deceased exempt from execution, * * * The property thus set apart, if there be a widow, shall by such judgment be decreed her property to be used and expended by her for the maintenance of herself and the minor children of deceased, if any, * * *"
[2] Title 61, ch. 12, ACLA 1949.
[3] Note 1, supra.
[4] See In re Brooks' Estate, 1946, 28 Cal.2d 748, 171 P.2d 724, 727-728. Cf. In re Aamoth's Estate, 1953, 197 Or. 267, 253 P.2d 269, 272, 34 A.L.R.2d 1051.
[5] In re Aamoth's Estate, supra note 4, 253 P.2d at page 272.
[6] Section 65-8-1, ACLA 1949.
[7] Yates v. Dohring, 1946, 24 Wash.2d 877, 168 P.2d 404, 406.
[8] Revised Code of Washington, § 26.16.030.
[9] See In re Slocum's Estate, 1915, 83 Wash. 158, 145 P. 204, 205; Stephens v. Nelson, 1950, 37 Wash.2d 28, 221 P.2d 520, 522.
[10] Lanigan v. Miles, 1918, 102 Wash. 82, 172 P. 894, 896; Togliatti v. Robertson, 1948, 29 Wash.2d 844, 190 P.2d 575, 578; In re Binge's Estate, 1940, 5 Wash.2d 446, 105 P.2d 689, 705.
[11] Togliatti v. Robertson, supra note 10.
[12] Togliatti v. Robertson, supra note 10; In re Armstrong's Estate, 1949, 33 Wash.2d 118, 204 P.2d 500, 504.
[13] Lanigan v. Miles, supra, note 10, 172 P. at page 896.
[14] 42 U.S.C.A. § 402(i).
[15] Colbert v. Folsom, 2 Cir., 1956, 230 F.2d 846.
[16] Cf. Wissner v. Wissner, 1950, 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424. And see Colbert v. Folsom, supra note 15.
[17] In re Witte's Estate 1944, 21 Wash.2d 112, 150 P.2d 595, 601.
[18] Section 1865, Compiled Laws of Alaska 1913.
[19] See Rowland v. Philadelphia & B.R. Co., 1893, 63 Conn. 415, 28 A. 102, 103.
[20] Chapter 49, SLA 1931.
[21] 5 Wigmore on Evidence, § 1576, p. 438 (3rd ed. 1940).
[22] Section 58-6-1, ACLA 1949.
[23] McCormick, Evidence, § 254, p. 548 (1954).