[No. 40952-6-II.    Division Two.    September 7, 2011.]

SEASHORE VILLA ASSOCIATION ET AL., *Respondents*, v. HAGGLUND FAMILY LIMITED PARTNERSHIP ET AL., *Appellants*.

EMERALD PROPERTIES LLC, *Appellant*, v. JOHN DOE DODGE ET AL., *Respondents*.

*Philip A. Talmadge* and *Sidney C. Tribe* (of *Talmadge/Fitzpatrick*); *Walter H. Olsen Jr.* (of *Olsen Law Firm PLLC*); and *Troy R. Nehring* (of *Nehring Law Firm PLLC*), for appellants.

*Dan R. Young*, for respondents.

¶1 PENOYAR, C.J. — Hagglund Family Limited Partnership; the Salvation Army; PCF Management Services Inc.; and Emerald Properties LLC, d/b/a Seashore Villa Mobile Home Park (collectively Park) appeal the trial court's issuance of a permanent injunction enjoining the Park from transferring to its tenants the responsibility of maintaining the carports and storage sheds the park owner constructed on its tenants' lots. The injunction also enjoins the Park from removing the carports or storage sheds without the tenants' uncoerced, written consent. The Park argues that the trial court erred in ruling that (1) it had violated RCW 59.20.135[1] and (2) a contract implied in fact existed between the Park and its tenants, in which the Park agreed to maintain the storage sheds and carports. We affirm the trial court's ruling that the Park's letter, asking tenants to sign an agreement transferring the ownership and responsibility for maintenance of the storage sheds and carports from the landlord to the tenants, violated RCW 59.20.135. But we reverse the trial court's ruling that a contract implied in fact existed between the parties and remand with instructions to vacate that portion of the injunction permanently enjoining the Park from removing the carports or storage sheds without the tenants' uncoerced, written consent.

## FACTS

¶2 Seashore Villa Mobile Home Park is a mobile home park in Olympia for individuals 55 years of age and older. There are 110 mobile home lots in the Park. Tenants rent a lot for their mobile homes.

¶3 According to the Park, the Hagglund Family Limited Partnership owns the land situating Seashore Villa. The Hagglund Family donated a portion of the ownership of the

---

[1] RCW 59.20.135(2) prohibits mobile home park owners "from transferring responsibility for the maintenance or care of permanent structures within the mobile home park to the tenants of the park."

mobile home park to the Salvation Army. In 1992, the Hagglund Family and the Salvation Army jointly owned the mobile home park and leased the operation of the mobile home park to Emerald Properties LLC. PCF Management Services Inc. is the property manager for Emerald.

¶4 Construction of Seashore Villa was completed in the 1980s. The Park built storage sheds and carports on many of the lots in the mobile home park. Initially, when Seashore Villa sought tenants, advertisements ran in the local paper that marketed carports and sheds as amenities the mobile home park provided to residents.[2] In 1979, the mobile home park charged some tenants $3.50 each month for carports and $5.00 each month for storage sheds. In 1981, leases included a provision stating that rent included carports and storage sheds. In 1984, Seashore Villa's rules and regulations read, "CARPORTS AND STORAGE SHEDS are provided by the park for use by the tenants. All tenants are required to keep their carports and storage sheds clean and free of moss, etc." Clerk's Papers (CP) at 49. In 1991, the rules and regulations stated that the carports and storage sheds "are provided 'as is' for use by the tenants. All tenants are required to keep their carports and storage sheds clean and free of moss, etc. Maintenance is the responsibility of the resident/tenant." Exs. 1, 25, 215. Seashore Villa's current rules and regulations state, "Mobile home, [c]arports and storage sheds are to be kept clean and free of moss, etc." CP at 173.

¶5 In 1994, the legislature added a provision to the Manufactured/Mobile Home Landlord-Tenant Act (MHLTA)[3] prohibiting landlords from transferring responsibility to maintain permanent structures within the mobile home park to the park's tenants. RCW 59.20.135(2). In 2000, PCF sent a letter to the Seashore Villa Association, stating, "Emerald

---

[2] The advertisement read, "Rent includes curved wide paved streets, double carport, large storage shed, beach privileges, swimming pool, cable TV, club rooms, large lots, complete security, and much more." Clerk's Papers at 46.

[3] Ch. 59.20 RCW.

Properties L.P. regards the sheds and carports to be owned by the owners of each unit. . . . The maintenance of these items is the responsibility of their owners." CP at 42. On June 28, 2005, Emerald sent a rent increase/notice of change of rental to each of its tenants. The notice informed tenants:

> As you may recall, the management has advised you in prior years that the Park does not own any carport or storage shed that may be situated on your space. To clarify this, another purpose of this notice is to advise you that your new rent on the 1st day of October 2005 will not include the amenity of a storage shed or carport at your space. Insofar as you do not believe that you own any storage shed or carport at your space, the Park will arrange for the removal of the carport or shed. If you wish to keep your carport or storage shed at your space, please sign and return the attached Storage Shed/Carport Agreement to the management prior to the 1st day of October 2005.

CP at 43, 136. The "Storage Shed/Carport Agreement" stated, in part:

> The Tenant hereby requests that the ownership and responsibility for maintenance of the Storage Shed and/or Carport at the Tenant's Mobile Home Lot be transferred to Tenant.
>
> The Landlord hereby transfers the ownership and responsibility for maintenance of the Storage Shed and/or Carport at the Tenant's Mobile Home Lot to Tenant.
>
> The Tenant hereby releases and holds Landlord harmless from any and all liabilities, claims or actions for loss, and damages from any and all liability whatsoever that may arise from the Tenant's use, ownership, and maintenance of the Storage Shed and Carport, including without limitation any alleged violation of RCW 59.20.135.

CP at 44.

¶6 In October 2005, Seashore Villa Association and individual tenants (collectively Association) filed a lawsuit against the Hagglund Family Limited Partnership, the Salvation Army, and PCF, requesting a temporary restrain-

ing order and a permanent order enjoining the park owners, PCF, and their successors from removing the carports and sheds from the tenants' lots; an order declaring the park owner's obligation to maintain the carports and sheds under RCW 59.20.135; and an order declaring void any agreement, signed by a tenant, to maintain the carports and storage sheds. Emerald then filed a lawsuit against individual tenants, seeking declaratory relief that its letter did not violate RCW 59.20.135. The cases were not consolidated; however, they were tried jointly and considered together.

¶7 The Association and Emerald both moved for summary judgment. The trial court entered an order granting the Association partial summary judgment and issued a preliminary injunction "enjoining defendants and their agents from removing the carports or sheds it constructed on tenants' lots in Seashore Villa Mobile Home Park without the uncoerced, written consent of the respective tenants." CP at 626. The trial court denied Emerald's motion for summary judgment. It reserved all other issues for trial.

¶8 The case proceeded to trial before a different judge. Ultimately, the trial court granted a permanent injunction consistent with the first judge's order.

¶9 The Hagglund Family Partnership, the Salvation Army, and PCF moved for reconsideration, arguing that the trial court's decision constituted an unconstitutional taking of private property and that RCW 59.20.135, as the trial court applied it, violated the state and federal constitutions by impairing the contractual relationship between the parties. The trial court denied the motion for reconsideration.

¶10 The trial court reasoned, in a letter opinion, however, that "[t]he removal of [the carports and storage sheds] is not prohibited by RCW [59.20.135]. Rather, it is prohibited by contract law." CP at 580. The trial court also changed the language of the injunction to read:

[Landlord is permanently] enjoined (1) from transferring to tenants responsibility for maintenance of the carports or sheds the park owner constructed on tenants' lots in Seashore Villa Mobile Home Park without the uncoerced written consent of the respective tenants; and (2) from removing carports or sheds the park owner constructed on tenants' lots in Seashore Villa Mobile Home Park without the uncoerced written consent of the respective tenants during such times as Tenants are in possession of the lot on which the structure is located.[4]

CP at 580. The trial court awarded attorney fees to the Association and entered findings of fact and conclusions of law. The trial court then consolidated the cases for appeal.

¶11 The Park petitioned for direct review. The Supreme Court transferred the case to us.

## ANALYSIS

### I. RCW 59.20.135

#### A. STATUTORY INTERPRETATION

¶12 First, the Park argues that the trial court erred in concluding that its letter violated RCW 59.20.135. Specifically, the Park argues, "By its plain terms, RCW 59.20.135 does not bar a mobile home park owner from choosing to dispense with certain park amenities as part of a leasehold." Appellant's Br. at 16. We disagree.

¶13 We review de novo questions of statutory interpretation. *State v. Gonzalez*, 168 Wn.2d 256, 263, 226 P.3d 131, *cert. denied*, 131 S. Ct. 318 (2010). The goal of statutory interpretation is to effectuate the legislature's intent. *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 708, 153 P.3d 846 (2007). First, we look at the statute's plain language. *City of Seattle v. Holifield*, 170 Wn.2d 230, 237,

---

[4] The trial court excluded from the injunction tenants who had constructed their own storage sheds and carports. Further, the trial court concluded that the Park was not responsible for major repairs to improvements that tenants had made to the carports and sheds.

240 P.3d 1162 (2010) (citing *Gonzalez*, 168 Wn.2d at 271). "If the plain language is subject to one interpretation only, our inquiry ends because plain language does not require construction." *Holifield*, 170 Wn.2d at 237. But if the statute is ambiguous, meaning it is subject to two or more reasonable interpretations, we resolve the ambiguity by looking at other indicia of legislative intent, including legislative history. *Bostain*, 159 Wn.2d at 708.

■■ ¶14 The statute at issue prohibits mobile home park owners from "transferring responsibility for the maintenance or care of permanent structures within the mobile home park to tenants of the park." RCW 59.20.135(2). It further provides, "A provision within a rental agreement or other document transferring responsibility for the maintenance or care of permanent structures within the mobile home park to the park tenants is void." RCW 59.20.135(2). Under the statute, a permanent structure includes "the clubhouse, carports, storage sheds, or other permanent structure. A permanent structure does not include structures built or affixed by a tenant. A permanent structure includes only those structures that were provided as amenities to the park tenants." RCW 59.20.135(3).

¶15 RCW 59.20.135(1) states:

The legislature finds that some mobile home park owners transfer the responsibility for the upkeep of permanent structures within the mobile home park to the park tenants. This transfer sometimes occurs after the permanent structures have been allowed to deteriorate. Many mobile home parks consist entirely of senior citizens who do not have the financial resources or physical capability to make the necessary repairs to these structures once they have fallen into disrepair. The inability of the tenants to maintain permanent structures can lead to significant safety hazards to the tenants as well as to visitors to the mobile home park. The legislature therefore finds and declares that it is in the public interest and necessary for the public health and safety to prohibit mobile home park owners from transferring the duty to maintain permanent structures in mobile home parks to the tenants.

Every duty under the MHLTA "imposes an obligation of good faith in its performance. . . ." RCW 59.20.020.

¶16 By its plain language, the statute unambiguously prohibits mobile home park owners from transferring responsibility to care for the park's permanent structures, including carports and storage sheds, to the park's tenants. By threatening to remove the structures if tenants declined to take ownership of the structures and to, thus, maintain the carports and storage sheds, the Park attempted to transfer its duty to maintain the permanent structures to the tenants.

¶17 The Park asserts that the trial court's "interpretation of RCW 59.20.135 flies in the face of those decisions regarding the ability of a park owner to alter the terms of a lease agreement with the tenant upon its annual renewal under MHLTA" and cites *McGahuey v. Hwang*, 104 Wn. App. 176, 15 P.3d 672 (2001). Appellant's Br. at 20. In *McGahuey*, tenants filed a complaint with the Department of Housing and Urban Development (HUD) alleging discrimination after their landlord imposed a $15 fee for each occupant over two per mobile home unit. 104 Wn. App. at 177-78. HUD issued a charge of discrimination, and the United States filed a lawsuit against the landlord in federal court. *McGahuey*, 104 Wn. App. at 178. The landlord asserted that the $15 fee was necessary to cover additional utility expenses. *McGahuey*, 104 Wn. App. at 178. The tenants also filed a lawsuit in state court. *McGahuey*, 104 Wn. App. at 178-79. The parties signed an order in federal court establishing the rent at $450 or at $375 plus utilities actually used by the unit. *McGahuey*, 104 Wn. App. at 179. After the parties signed the order, the state court granted the landlord's motion for summary judgment. *McGahuey*, 104 Wn. App. at 180.

¶18 On appeal in state court, the tenants argued that despite the federal order, the landlord did not have authority under the MHLTA to require the tenants to pay utilities in addition to base rent. *McGahuey*, 104 Wn. App. at 180.

Specifically, the tenants argued that the MHLTA prohibited their landlord from requiring a tenant to pay for utilities when their original lease required the landlord to do so. *McGahuey*, 104 Wn. App. at 181. The tenants cited RCW 59.20.090(1),[5] which provides that leases automatically renew at the end of their term. *McGahuey*, 104 Wn. App. at 181. Division One of this court held that the landlord did not violate the MHLTA by requiring her tenants to start paying for utilities because (1) nothing in the MHLTA stated that a landlord could not increase or impose fees for services in addition to the rent, but there were portions of the statute stating that any increases must be equitable and (2) the only limitation on increases in the MHLTA is the requirement that rental rates be increased only upon lease expiration and three months' notice. *McGahuey*, 104 Wn. App. at 182. The court reasoned:

> [The legislature] recognized that mobile homes are difficult and expensive to move and, to protect tenants from the instability inherent in most rental arrangements, it provided for automatic renewal and a long notice period for rent increases. But it did not require that all original lease terms remain in force through every automatic renewal because renewals could extend for countless years. By not regulating them, the [l]egislature did allow changes in the lease terms to permit the landlord to charge for utilities, so long as they were limited to the actual cost. This is nothing more than a practical acknowledgement that costs increase and those using a service may be required to pay for it.

*McGahuey*, 104 Wn. App. at 183.

¶19 The reasoning in *McGahuey* arguably supports the Park's assertion that the MHLTA does not require original lease terms to stay in effect through every automatic renewal. But this case is factually distinguishable from

---

[5] RCW 59.20.090(1) states, "Unless otherwise agreed rental agreements shall be for a term of one year. Any rental agreement of whatever duration shall be automatically renewed for the term of the original rental agreement, unless a different term is agreed upon."

*McGahuey* because here there is language in the MHLTA prohibiting the landlord from transferring the duty to maintain the structures to the Park's tenants. Additionally, the trial court found only that transferring the duty to care for the permanent structures *during the current lease term* would violate RCW 59.20.135. The trial court used contract law to support its conclusion that the landlord could not remove the carports and sheds during the leaseholders' tenancies. We hold that the Park violated RCW 59.20.135 by asking tenants to sign an agreement transferring the ownership and responsibility for maintenance of the storage shed and carport from the landlord to the tenants.

B. RETROACTIVITY

¶20 The Park also argues that RCW 59.20.135 does not apply retroactively and is inapplicable to tenancies created before the statute's effective date. The Park asserts that "Emerald assumed managerial responsibility for Seashore Villa in 1992, and confirmed that it was the tenants' responsibility to maintain the carports and sheds on their lot." Appellant's Br. at 17. We note that at oral argument the Park stated that who owns the carports and storage sheds is not an important issue:

> I think, for purposes of our analysis of the injunction and our analysis of the statute, who owns them is really not critical. The critical point here is the tenants have the right to use these carports and sheds but the landlords have the right to remove them at the conclusion of the one-year time period that the Mobile Home Landlord Tenant Act provides is the duration for a lease.

Wash. Court of Appeals oral argument, *Seashore Villa Ass'n v. Hagglund Family Ltd. P'ship*, No. 40952-6-II (Feb. 15, 2011), at 4 min., 43 sec. (on file with court). We conclude that there is no evidence that the Park transferred the duty to conduct major repairs of the permanent structures to the tenants before the enactment of the 1994 statute.

¶21 We need not address retroactivity of the statute because substantial evidence supports the trial court's

finding that in 1994, the year the statute became effective, while the tenants had the duty to perform regular maintenance, the Park had the duty to maintain the storage sheds and carports and had not transferred this responsibility to the tenants. Substantial evidence supports the trial court's findings of fact, and these findings support the trial court's conclusions of law. *See City of Tacoma v. State*, 117 Wn.2d 348, 361, 816 P.2d 7 (1991). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the finding's truth. *State v. Halstien*, 122 Wn.2d 109, 129, 857 P.2d 270 (1993). The trial court found that "[e]arly leases and rules and regulations of the park made it clear that these improvements belonged to the lessor, but the residents were responsible for regular maintenance and upkeep (cleaning of gutters, removal of moss and mildew, and cleaning of exterior surfaces)"; that "[e]ither express or implied in the lease agreement and the accompanying rules and regulations entered into by the landlord and tenants was a commitment on the part of the landlord to maintain the structures"; and that "[b]eginning in the early 1990's and continuing until the present time, rental agreements contained no specific language regarding the ownership, maintenance or upkeep of carports and storage sheds." CP at 553.

¶22 In 1984, Seashore Villa's rules and regulations read, "CARPORTS AND STORAGE SHEDS are provided by the park for use by the tenants. All tenants are required to keep their carports and storage sheds clean and free of moss, etc." CP at 49. In 1991, rules and regulations stated that the carports and storage sheds "are provided 'as is' for use by the tenants. All tenants are required to keep their carports and storage sheds clean and free of moss, etc. Maintenance is the responsibility of the resident/tenant." Exs. 1, 25. Seashore Villa's current rules and regulations state, "Mobile home, [c]arports and storage sheds are to be kept clean and free of moss, etc." CP at 173. The leases contain no language regarding the storage sheds and carports. In

2000, PCF sent a letter to the Association stating, "Emerald Properties [LLC] regards the sheds and carports to be owned by the owners of each unit. . . . The maintenance of these items is the responsibility of their owners." CP at 42. Substantial evidence supports the conclusion that it has always been the tenants' responsibility to conduct daily maintenance of the structures and that there is no evidence that the Park transferred to the tenants the responsibility of conducting major repairs before the enactment of the 1994 statute.

## II. CONTRACT IMPLIED IN FACT

¶23 Next, the Park argues that the trial court erred in finding the existence of a contract implied in fact because "[t]here is no evidence here that the parties *agreed* at the time the tenants first came to Seashore Villa that carports or sheds would be offered by [the Park] or its predecessor in perpetuity." Appellant's Br. at 26. We agree.

¶24 The trial court entered several findings to support its conclusion that a contract implied in fact to provide storage sheds and carports existed between the Park and the tenants.[6] These include the findings that the structures were intended to be permanently attached to the ground and were not intended to be removed, that the structures were built to induce tenants to locate mobile homes in the park and reside in the park, and that the tenants reasonably relied on the Park's advertisements and representations regarding carports and sheds and entered into lease agreements with the landlord. Even if substantial evidence supports these findings, these findings do not support the

---

[6] The only finding the Park challenges pertaining to this issue is finding of fact 11: "Some tenants have at their own expense improved the carports and sheds, e.g., by adding walls, electrical power and windows. The act of providing improvements alone is not sufficient to change the ownership of the underlying structures." CP at 553. It appears that the Park is challenging this finding on the basis that it is actually a conclusion of law. However, this finding appears to pertain to the issue of whether the Park violated RCW 59.20.135, not the contract issue. We have already affirmed the trial court's ruling that the Park violated this statute.

conclusion that a contract implied in fact exists between the Park and the tenants and that removal of the carports and storage sheds would be a breach of the lease agreement.[7]

¶25 A contract implied in fact arises from facts and circumstances indicating a mutual consent and intent to contract. *Young v. Young*, 164 Wn.2d 477, 485-86, 191 P.3d 1258 (2008) (quoting *Johnson v. Nasi*, 50 Wn.2d 87, 91, 309 P.2d 380 (1957)). An advertisement is generally not an offer. 25 DAVID K. DEWOLF, KELLER W. ALLEN & DARLENE BARRIER CARUSO, WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 2:12, at 50 (2d ed. 2007). Here, there was no mutual intent to enter into an agreement that the Park would not dispose of the tenants' carports and storage sheds as long as a tenant remained at the mobile home park. Undoubtedly, the structures were built as permanent structures on the property to attract tenants; however, construction of the mobile home park began in the 1970s. Even if an implied contract existed at the time the parties entered into the initial lease agreement, the leases were for terms of one year. These one-year leases have been renewed many times over the past three decades; and, as we discussed above, not all original lease terms must remain in force through every automatic renewal. Further, Seashore Villa management changed in 1992, when Emerald obtained a lease to operate the mobile home park. The Association failed to prove that a meeting of the minds occurred in which the Park agreed to provide storages sheds and carports from the point of the tenants' original leases through each renewal of the tenants' leases. Thus, we reverse the trial court's conclusion that a contract implied in fact existed between the parties.

¶26 The Association argues that "[t]here are insurmountable difficulties in the park owner's claimed ability to remove carports and sheds at the end of a one-year lease

---

[7] The trial court ruled, in a letter opinion, that "[t]he removal of [the carports and storage sheds] is not prohibited by RCW [59.20.135]. Rather, it is prohibited by contract law." CP at 580. Conclusion of law 10 states, "The landlord's removal of the carports and sheds during the tenancy of tenants would be a breach of the lease agreement." CP at 556.

term." Resp't's Br. at 33 (capitalization and emphasis omitted). The Association argues that the Park has no legal right to enter the lots and remove the carports and sheds. Landlords, however, may enter the land on which a mobile home is situated:

> The ownership or management shall have a right of entry upon the land upon which a mobile home, manufactured home, or park model is situated for maintenance of utilities, to insure compliance with applicable codes, statutes, ordinances, administrative rules, and the rental agreement and the rules of the park, and protection of the mobile home park at any reasonable time or in an emergency, but not in a manner or at a time which would interfere with the occupant's quiet enjoyment. The ownership or management shall make a reasonable effort to notify the tenant of their intention of entry upon the land which a mobile home, manufactured home, or park model is located prior to entry.

RCW 59.20.130(7). Accordingly, the landlord could, after notifying the tenant, enter the lots to ensure conformity with the terms of the lease and the Park's rules and regulations.

¶27 We hold that the trial court erred in concluding that a contract implied in fact existed between the Park and the tenants, but we note that the statute does not prohibit the park owner from transferring the responsibility to maintain the permanent structures to any tenants at the tenants' request. *See* RCW 59.20.135(4).[8]

III. ATTORNEY FEES

¶28 The Park contends that the trial court erred in awarding the Association attorney fees under RCW 59.20-.110. Additionally, both parties request attorney fees on appeal under RAP 18.1 and RCW 59.20.110.

---

[8] "Nothing in this section shall be construed to prohibit a park owner from transferring responsibility for the maintenance or care of permanent structures within the mobile home park to an organization of park tenants or to an individual park tenant when requested by the tenant organization or individual tenant." RCW 59.20.135(4).

¶29 "In any action arising out of [the MHLTA], the prevailing party shall be entitled to reasonable attorney's fees and costs." RCW 59.20.110. A prevailing party is one who obtains a judgment in its favor. *Riss v. Angel*, 131 Wn.2d 612, 633, 934 P.2d 669 (1997). If neither party prevails, the party that substantially prevails is entitled to attorney fees. *Marassi v. Lau*, 71 Wn. App. 912, 916, 859 P.2d 605 (1993), *abrogated on other grounds by Wachovia SBA Lending, Inc. v. Kraft*, 165 Wn.2d 481, 200 P.3d 683 (2009). If both parties prevail on major issues, both parties bear their own attorney fees. *Phillips Bldg. Co. v. An*, 81 Wn. App. 696, 702, 915 P.2d 1146 (1996).

¶30 The trial court granted the Association attorney fees under RCW 59.20.110 on the basis that the tenants were the prevailing parties. Because we reverse the trial court's finding that an implied contract in fact existed between the parties, the Association is no longer the prevailing party; nor does our partial reversal render the Association a substantially prevailing party. Therefore, we reverse the trial court's award of attorney fees.

¶31 On appeal, both parties prevail on major issues. The Association prevails on the issue of whether the Park's letter violated RCW 59.20.135, but the Park prevails on the issue of whether the trial court erred by finding a contract implied in fact. Moreover, we vacate only one portion of the permanent injunction. Thus, neither party substantially prevails on appeal and neither is entitled to attorney fees on appeal.

¶32 We affirm in part, reverse in part, and remand with instructions to vacate the portion of the injunction permanently enjoining the Park from removing the carports or storage sheds without the tenants' uncoerced, written consent.

HUNT and JOHANSON, JJ., concur.